UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


Case No. 05-10334-DPW



GARY GITTO,

v.

WORCESTER TELEGRAM & GAZETTE
CORP., MEDIANEWS GROUP, INC.,
CHARLES L. GLERUM, EXAMINER, and
PHOEBE MORSE, UNITED STATES TRUSTEE

---

ON APPEAL FROM AN ORDER

OF THE BANKRUPTCY COURT

---

BRIEF OF APPELLANT

---

Max D. Stern
BBO No. 479560
Lillian Hirales
BBO No. 652698
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114
(617) 742-5800

Dated: March 2, 2005

# TABLE OF CONTENTS

**Page**

Appellate Jurisdiction                                                                 1

Statement of the Issues and Applicable Standard
of Appellate Review                                                                   2

Statement of the Case                                                                 3

    Proceedings in the Bankruptcy Court                                    3

    The Nature of the Examiner's Report                                   6

    The Appeal                                                            8

Argument                                                                             8

I.    The Examiner's Report is Not a Public Document
    Under Either 11 U.S.C. §107(a) or the Common Law
    Presumptive Right of Public Access to Judicial Documents.             8

    A.    The Nature of the Examiner's Duties and
        the Purpose of the Report.                           8

    B.    The Report is Not a Public Document
        Under 11 U.S.C. §107(a).                            11

    C.    There is No Common Law Right of Public Access to
        the Examiner's Report As It is Not a Judicial Record.   12

II.    Even If the Report Were a Public or Judicial Record,
    The Bankruptcy Judge Erred in Ordering It Released,
    Since He Did Not Balance the Presumption of Public
    Access Against Countervailing Interests, and Did Not
    Exercise His Discretion to Impound It if There is a
    "Genuine Risk of Substantial Harm."                                  14

    A.    In Determining Whether to Release a Presumptively
        Accessible Document, a Court Must Exercise Discretion,
        By Considering Countervailing Interests Against a
        Presumption Whose Weight is Determined by Its Role
        in the Exercise of Judicial Powers.                   14

**Page**

B.    The Bankruptcy Judge Employed The Wrong
      Standard; He Did Not Engage in a Balancing
      Test and Did Not Consider Whether There
      Was a Genuine Risk of Substantial Harm.                    16

C.    An Exercise of Discretion Under the
      Appropriate Standards Would Have Led to
      Impoundment of the Report.                                 19

III.   There Is No First Amendment Right of Public Access
       to the Examiner's Report.                                 22

Conclusion                                                       25

# TABLE OF AUTHORITIES

## CASES

In re 50-Off Stores, Inc., 213 B.R.646 (Bankr.W.D.Tex. 1997)     15

In re 1243 20th Street, Inc., 6 B.R. 683 (Bankr.D.C. 1980)     10

Anderson v. Cryovac, Inc., 805 F.2d 1 (1st Cir. 1986)     13, 23

In re Apex Oil Co., 101 B.R. 92 (E.D.Mo. 1989)     13

In re Baldwin United Corp., 46 B.R. 314 (Bankr.S.D.Ohio 1985)     11, 13

In re Bank of New England Corp., 218 B.R. 643 (1st Cir. 1998)     1

In re Boston Herald, Inc., 321 F.3d 174 (1st Cir. 2003)     13, 14, 22, 23

In re Continental Airlines, Inc., 150 B.R. 334 (D.Del.1993)     18

Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211 (1979)     21, 22

Federal Trade Commission v. Standard Financial Management, 830 F.2d 404
(1st Cir.1987)     13

Gannett Co. v. Pasquale, 443 U.S. 368 (1979)     20, 24

In re Gilman Services, 46 B.R. 322 (Bankr. D.Mass. 1985)     8, 10

In re Globe Newspaper Co., 729 F.2d 47 (1st Cir. 1984)     17, 20, 21

Globe Newspaper Co. v. Fenton, 819 F. Supp. 89 (D.Mass. 1993)     23

Globe Newspaper Co. v. Pokaski, 868 F.2d 497 (1st Cir. 1989)     13, 21

In re Hamiel & Sons, Inc., 20 B.R. 830 (Bankr.S.D.Ohio 1982)     11

In re International Distribution Centers, Inc., 74 B.R. 221 (S.D.N.Y. 1987)     9

In re Mako, Inc., 102 B.R. 809 (Bankr.E.D.Ok. 1988)     10

Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978)     12, 14, 15

In re Phar-Mor, Inc., 191 B.R. 675 (Bankr. N.D.Ohio 1995)    17

Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984)    19, 24

Press-Enterprise Co. v. Superior Court of California, 478 U.S.1 (1986)    22, 23

In re Providence Journal Co., 293 F.3d 1 (1st Cir. 2002)    22, 24

In re Public Service Co. of New Hampshire, 99 B.R. 177 (Bankr.D.NH 1989)    10

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980)    22

Schuster v. Dragone, 266 B.R. 268 (D.Conn. 2001)    10

Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984)    14, 23

In re UNR Industries, Inc., 72 B.R. 789 (Bankr.N.D.Ill. 1987)    10

United States v. Amodeo, 44 F.3d 141 (2nd Cir. 1995)    14, 16

United States v. Amodeo, 71 F.3d 1044 (2nd Cir. 1995)    13, 15, 16, 20

United States v. Gonzalez, 150 F.3d 1246 (10th Cir. 1998)    13

In re Whitener, 57 B.R. 707 (Bankr.E.D.Va. 1986)    18

Dulgarian v. Stone, 420 Mass. 843 (1995)    17

Poland & Post Broadcasting Co., 330 Mass. 701 (1953)    17

## STATUTES

11 U.S.C. §§ 105    15

11 U.S.C. § 107    1, 2, 6, 7, 8, 11, 15

11 U.S.C.§1104    3, 8, 9

11 U.S.C. §1106    9, 12

28 U.S.C. § 158    1

## **OTHER**

124 Cong. Rec. H11, 103                                                                          11

H.R. Rep. No. 595, 95th Cong., 1st Sess. 402-03 (1977)                                            8

L. King, 7 Collier on Bankruptcy, ¶ 1104.LH[2][b], 1104-52-53 (15th ed. 2004)                     8

Norton Bankruptcy Law and Practice 2d, § 79:24 (2004)                                            11

## **APPELLATE JURISDICTION**

This Court has jurisdiction of an appeal from a final decision of a bankruptcy judge pursuant to 28 U.S.C. § 158(a)(1).  In a bankruptcy case, a court's order is final within the meaning of § 158(a)(1) if it conclusively determines a discrete dispute within the larger case. See In re Bank of New England Corp., 218 B.R. 643, 641 (1st Cir. 1998).  A party takes an appeal of a § 158(a)(1) final order "as of right" by filing a timely notice of appeal.  Id. at 645; Fed.R.Bankr.P. 8001(a).  The appellant's amended notice of appeal was timely filed on February 15, 2005.

## STATEMENT OF THE ISSUES

1.  Whether the Examiner's Report is a public record within the meaning of 11 U.S.C. §107.

2.  Whether the examiner's report is a judicial document to which the First Amendment and/or common law presumptive right of public access applies.

3.  Whether, even if the examiner's report is a public or judicial record, the bankruptcy judge applied the correct standard in determining whether or not to impound the report.

4.  Whether the bankruptcy judge properly considered whether there was a genuine risk of substantial harm in the public disclosure of the examiner's report.

## APPLICABLE STANDARD OF APPELLATE REVIEW

The standard of review in this case is <u>de novo</u>.  This is the appropriate standard of review for questions of law.  While the standard of review for an exercise of discretion is abuse of discretion, in this case, as set forth below, the Bankruptcy Court failed to exercise its discretion. The question of whether the bankruptcy judge was obliged to exercise discretion, and what the appropriate legal standard for the exercise of that discretion would be, are questions of law.

## STATEMENT OF THE CASE

### Proceedings in the Bankruptcy Court

On September 17-18, 2004, all of the officers and directors of the Gitto Global Corporation ("Gitto Global") resigned and were replaced by Thomas Doherty of Argus Management as Chief Restructuring Officer.  On September 24, 2004, Gitto Global filed a voluntary Chapter 11 petition in bankruptcy.  With the new management in place, the debtor was permitted to remain as debtor in possession and its plan was to operate the company solely for the purpose of selling the business as a going concern.  (A. 083-084).[1]

On October 7, 2004, the United States Trustee ("UST") moved that the bankruptcy court appoint a Chapter 11 trustee, or alternatively, an examiner, under 11 U.S.C.§1104, to conduct "an investigation into the likely fraudulent pre-petition activities of the Debtor and its principals." (A. 091).  On October 14, 2004, the court ordered the appointment of an examiner, who "shall immediately begin an investigation into the investigation of any prepetition fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management and business affairs of the Debtor." (A. 094).  The court further ordered that the examiner should "file a statement with the Court, and transmit a copy of same to the UST, the Debtor, and the respective counsel to the Debtor, the Committee, and LaSalle Business Credit, Inc., reporting the preliminary or final findings of the Examiner, along with any recommendations of the Examiner for further investigation." (Id.).

By November 5, 2004, the debtor had put the business enterprise on the market and proposed to sell substantially all of its assets to GGC Acquisition for $8,550,000.  (A. 101).

---

[1] The Appendix to the Brief shall hereafter be referred to as (A. __).

When certain questions arose as to the real party in interest in the sale, the court directed the examiner to file a report on the matter. The Examiner then filed a report on December 6, 2004, summarizing the state of his knowledge on the issue. (A. 116-117). After an additional bid was received, on December 10, 2004, the court approved the sale to a different buyer, for $8,977,500. (A. 139-140).

In the meantime, the Examiner conducted his principal investigation, obtaining documents and interviews both on a voluntary basis and pursuant to compulsory process authorized by the court.[2] On December 8, 2004, as the time for the Examiner's report was approaching, he filed a motion to submit under seal and have impounded the Examiner's preliminary report. In support, he noted that:

> [t]he pending Report is preliminary and the Examiner expects the Official Committee of Unsecured Creditors (the "Committee") or others to continue the Examiner's investigation after the submission of the Report. In addition, the Report will contain highly sensitive matters, perhaps including allegations of criminal activity and fraud. The Examiner believes that publicizing the Report may chill the cooperation of parties subject to the continued investigation and, more importantly, those with knowledge of the relevant circumstances, and thereby impede completion of the investigation and possible recovery actions. Pursuant to MLBR 9018-1, the Examiner contends that this relects a "genuine risk of substantial" harm to certain interested parties, including the Debtor's estate and certain creditor of the Debtor.

(A. 135). This motion was allowed on December 9, 2004, "subject to allowance of any future motion of any party seeking release of Report." (A. 137).

---

[2] See Omnibus Motion for 2004 Examination of Various Persons and Entities (First), October 27, 2004, Docket No. 146, and Omnibus Motion for 2004 Examination of Various Persons and Entities (Second), November 5, 2004, Docket No. 185.

On December 23, 2004, the Worcester Telegram & Gazette Corporation moved to intervene and filed a motion for public access to the examiner's report. (A. 146). On January 5, 2005, the MediaNews Group, Inc. (publisher of the Sentinel & Enterprise Newspaper) also filed a motion to intervene and obtain public access to the examiner's report.

The Examiner opposed these requests on January 5, 2005. (A. 164). The court then ordered the Examiner to file the report, under seal, by January 7, 2005, and, within 10 days thereafter, to provide each person in the report with a copy of "only that portion or portions of the report that relate to the individual." (A. 171). The court also ordered any person seeking to seal all or redact part of the report to file a motion seeking that relief by January 25, 2005, and that a hearing on these motions would be held on February 9, 2005. (A. 172). In accordance with the order, the Examiner filed his report under seal on January 7, 2005, and on January 18, 2005, he submitted selected portions of the report to the corresponding persons, including appellant.

On January 25, 2005, the appellant (along with numerous other interested parties) moved to impound the report from public access. (A. 178). Appellant did not oppose the disclosure of the report to certain interested parties, under seal, including the Creditor's Committee, LaSalle Business Credit, LLC, and the United States Trustee. Appellant argued that the report was not a record presumptively available to the public, and if it was, there was a compelling interest in impounding it. He pointed out that a federal grand jury is currently conducting an investigation and that indictments are highly likely. He requested that the court impound the report to protect his right to a fair trial in any ensuing criminal prosecution.

On Wednesday, February 9, 2005, the court held a hearing regarding various parties'

motions requesting that the Examiner's preliminary report be sealed.  After the hearing, the

court denied all motions to seal and ordered the report to be placed on the public electronic

docket on February 23, 2005.  (A. 213).  Its reasoning was as follows:  First, it held that since the

document had been filed with the court, it was necessarily a public document under 11 U.S.C.

§107.  (A. 220).  Second, it held that under §107, the only available ground for impoundment is

§107(b)(2), which requires a showing that the report contains information which is "scandalous

or defamatory."  (A. 221).  The court interpreted this to mean that the movant must produce

proof that the information is untrue.  The court held that Local Rule 9018-1(a), which authorizes

impoundment to prevent a "genuine risk of substantial harm," adds no authority to that set forth

in §107.  (A. 222).  And, although the court recognized a common law power to impound a

court's documents, it held that in exercising discretion, it would follow the standards under §107.

(A. 226).  Finally, the court ruled that, as none of the movants had provided proof of the

inaccuracy of the report, the motions were all denied. (A. 227).

 The bankruptcy case is now awaiting hearing on a motion by the United States Trustee to

convert the Chapter 11 proceeding into a liquidation under Chapter 7 on the ground that since the

assets have been sold and the debtor is unable to conduct ongoing business, and is without any

likelihood of rehabilitation, it is therefore unable to effectuate a plan.  There has been no

substantive objection to this motion.  (A. 173, 204).

 **The Nature of the Examiner's Report**

 The report is a 154-page document, with appendices and voluminous exhibits.

According to the Examiner, it is "preliminary," (A. 135), "interim," (A. 167), and "not final,"

(id.), and he emphasizes that more investigation and research must be conducted on potential

claims.[3]  The Examiner notes that it is "best considered" as a "foundation for continued

investigation and possible recovery actions" to be undertaken by succeeding functionaries and

parties.[4]  The preliminary nature of the report, however, did not prevent the Examiner from

including scathing allegations and conclusions against Gary Gitto throughout.  The report paints

a harsh picture of alleged fraud, misappropriation, and other misconduct.  Almost without

exception, the contents of the report adversely affect Mr. Gitto's reputation, as graphically

demonstrated by the fact that in order to comply with the Bankruptcy court's disclosure order, to

serve affected parties with portions that identify them, virtually the entire report had to be

delivered to him.

Given the purpose of the report  – to identify <u>potential</u> avenues for further investigation,

to collect information, and not to adjudicate any matters – and the compressed duration of the

investigative process, the allegations are necessarily not the product of adversarial testing and

are inescapably one-sided.  As the bankruptcy judge noted, the report relies on hearsay and

statements which have not been independently confirmed.  (A. 228).  And, as the Examiner

explains, "it seemed appropriate to include such statements, not so they would be assumed to be

fact, but so they could be further investigated and not forgotten."  (Id.)  Similarly, the report

refers throughout to the "Gitto Principals," (A. 229-30), without differentiation, because "the

Examiner lacks the information necessary to allocate precisely among the three[.]"[5]  Likewise,

--------------------------------------------------

[3] "The findings of the Examiner are not final; the Examiner's investigation, whether it is
carried on by the Examiner, LaSalle Bank, the United States Trustee's Office or the Creditors'
Committee, will be continued."  (A. 167).

[4] Report, p. 21.

[5] Report, p. 1.

the Examiner recognizes that the report lacks the "other side of the story" (A. 228), mostly because individuals have asserted their privileges not to testify and to prevent their attorneys from revealing confidences. (Id.). For all these reasons, the Examiner notes, "[c]ontinued investigation may lead to evidence which supports or contradicts th[e] statements [contained in the report]." (A. 229).

### The Appeal

The appellant noticed his appeal to this Court on February 15, 2005, and moved for a stay, which was denied by the bankruptcy judge. Thereafter, this Court granted the stay on February 22, 2005, and set an expedited briefing schedule.

## ARGUMENT

I.    **The Examiner's Report is Not a Public Document Under Either 11 U.S.C. §107(a) or the Common Law Presumptive Right of Public Access to Judicial Documents.**

### A. The Nature of the Examiner's Duties and the Purpose of the Report.

An examiner may be appointed in Chapter 11 proceedings when a debtor remains in possession of the enterprise, i.e., when no trustee has been appointed. 11 U.S.C. §1104©).[6] In such cases, the statute authorizes the appointment of an examiner:

> to conduct such an investigation of the debtor as is appropriate,
> including an investigation of any allegations of fraud, dishonesty,
> incompetence, misconduct, mismanagement, or irregularity in the

_____

[6] Prior to the enactment of the Bankruptcy Reform Act of 1978, the only authority the bankruptcy court had to appoint an examiner was in cases where the debtor's indebtedness did not exceed $250,000, and even then, an examiner was rarely appointed because of the nearly absolute presumption in favor of the appointment of a trustee. See H.R. Rep. No. 595, 95th Cong., 1st Sess. 402-03 (1977); see also L. King, 7 Collier on Bankruptcy, ¶ 1104.LH[2][b], 1104-52-53 (15th ed. 2004). The 1978 Act gave the court the alternative remedy of appointing an examiner in certain cases. See In re Gilman Services, 46 B.R. 322, 327 (Bankr. D.Mass. 1985).

management of the affairs of the debtor of or by current or former
management of the debtor[.]

11 U.S.C. § 1104©).

The duties of an examiner are set forth in 11 U.S.C. §1106(b), which refers back to those

duties of a trustee set out in 1106(a)(3) and (4).  Those duties are to:

> (3) except to the extent that the court orders otherwise, investigate
> the acts, conduct, assets, liabilities, and financial condition of the
> debtor, the operation of the debtor's business and the desirability
> of the continuance of such business, and any other matter relevant
> tot he case or to the formulation of a plan;
>
> (4) as soon as practicable –
>
>   (A) file a statement of any investigation conducted under
> paragraph (3) of this subsection, including any fact ascertained
> pertaining to fraud, dishonesty, incompetence, misconduct,
> mismanagement, or irregularity in the management of the affairs of
> the debtor, or to a cause of action available to the estate; and
>
>   (B) transmit a copy or a summary of any such statement to
> any creditors' committee or equity security holders' committee, to
> any indenture trustee, and to such other entity as the court
> designates;

11 U.S.C. §1106(b)

It is readily apparent from these provisions that the precise duties of an examiner, and the

nature and purpose of an examiner's report, vary widely according to the particular needs of the

case and the directions of the court.  See In re Int'l Distribution Centers, Inc., 74 B.R. 221, 224

(S.D.N.Y. 1987)(bankruptcy court must be afforded flexibility to fashion the examiner's powers

as specific circumstances may require).  By far the most frequent use of the examiner process is

to advise the court concerning the continued operation of the business in Chapter 11

proceedings, and so to assist the court in its supervision of the bankruptcy estate.  See L. King, 7

Collier on Bankruptcy, ¶ 1104.03[1], 1104-35.  Thus, an examiner's report might provide

-9-

information on the suitability or conduct of a debtor in possession,[7] or on the appropriateness of

a sale,[8] or concerning the advisability of a plan of reorganization.[9]  An examiner might also be

used to mediate and report on the status of negotiations[10] or otherwise to provide the court with

relevant information.[11]  An examiner is often used when the court has decided, at least

tentatively, to allow a debtor to remain in possession, but still wishes to have independent

verification of the appropriateness of the debtor's continued management.  See In re Mako, Inc.,

102 B.R. 809, 814 (Bankr.E.D.Ok. 1988)(the appointment of an examiner, who will keep his

"finger on the pulse of the business," was a less costly, intermediate method of policing the

[debtor in possession]).  An example of this type of usage was the Bankruptcy Court's resort in

this case to the Examiner for a report on a proposed buyer.  (A. 116).

    A totally different function of an examiner is to conduct an investigation solely to

-----

[7] See Schuster v. Dragone, 266 B.R. 268, 270 (D.Conn. 2001)(examiner appointed to to investigate the debtors' pre- and post-petition affairs and to monitor post-petition conduct and to ensure compliance with the Code).

[8] See In re Gilman Services, 46 B.R. 322, 328 (Bankr. D.Mass. 1985)(examiner appointed to investigate potential causes of action available to the estate, such as the sale of the debtor's principal asset as a fraudulent conveyance).

[9] See In re 1243 20th Street, Inc., 6 B.R. 683 (Bankr.D.C. 1980)(examiner's objective statement may be of immeasurable importance in determining those matters relating to the vital aspects of the reorganization case).

[10] See In re UNR Industries, Inc., 72 B.R. 789 (Bankr.N.D.Ill. 1987)(court appointed examiner to inquire of various parties as to their positions in negotiations and to mediate any differences that existed).

[11] See In re Public Service Co. of New Hampshire, 99 B.R. 177, 182 (Bankr.D.NH 1989)(examiner appointed to assist parties in achieving a consensual plan of reorganization and assist the court in understanding the "rather arcane concepts employed in the utility rate-setting regulatory world").

accumulate discovery for the use of the beneficiaries of the estate.[12]  This appears to be a far

more unusual role.  In this mode, the examiner's report is not to provide the basis for any

decision of the bankruptcy judge.  In fact, the reorganization process may continue independent

of the examiner's investigative function.[13]  Rather, the examiner's report is to develop

information and theories for potential use of particular parties.  See In re Hamiel & Sons, Inc., 20

B.R. 830 (Bankr.S.D.Ohio 1982)(examiner appointed to conduct an investigation as is

appropriate in the interests of unsecured creditors).  This was the purpose of this Examiner's

investigation and of the report which is the subject of this appeal.  For this reason, the Examiner

has, by his own account, not limited himself to verifiable facts and erred on the side of over-

inclusion: indeed, it was on this basis, he explains, that "it seemed appropriate to include such

statements, not so they would be assumed to be fact, but so they could be further investigated

and not forgotten."  (A. 228-29).

### B.  The Report is Not a Public Document Under 11 U.S.C. §107(a).

The bankruptcy judge concluded that the Examiner's report is a public record.  (A. 220).

His reasoning was as follows.  First, 11 U.S.C. §107(a)  provides that any "paper filed in a case

under this title and the dockets of the bankruptcy court are public records and open to

examination by an entity at reasonable times without charge."  (A. 221).  (emphasis added).

---

[12]  See In re Baldwin United Corp., 46 B.R. 314, 316 (Bankr.S.D.Ohio 1985)(the benefits of an examiner's investigative efforts flow solely to the debtor and to its creditors and shareholders).

[13]  See 124 Cong. Rec. H11, 103 (daily ed. Sept. 28, 1978)("It will not be necessary for the court to consider the report of the examiner prior to approval of a disclosure statement.  The investigation of the examiner is to proceed on an independent basis from the procedure of the reorganization under Chapter 11."); see also Norton Bankruptcy Law and Practice 2d, § 79:24 (2004).

Next, he noted, 11 U.S.C. §1106(a)(4)(A) requires that the examiner "<u>file</u> a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement of irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." (emphasis added). Therefore, he reasoned, "once an examiner's report is 'filed' with the Court, it becomes 'a paper filed with the court' and thus falls within the scope of Bankruptcy Code section 107." (A. 220).

But this syllogism is based upon an implicit but erroneous premise, to wit, that the reference to "filing" in §1106, with respect to an examiner's (or trustee's) report, means the same as the "filing" in the public docket contemplated by §107(a). The flaw in this reasoning is made evident by the very next subsection, §1106(a)(4)(B), which provides that the examiner shall also "transmit a copy or a summary of any such statement to any creditor's committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates." Obviously, if the report was already public, there would be no need to require a copy be transmitted to the creditor's committee, nor any need for the court to designate any other entity to receive it. Clearly, §107(a), by itself, does not establish the public nature of the report.

### C.    There is No Common Law Right of Public Access to the Examiner's <u>Report As It is Not a Judicial Record.</u>

Likewise, there is no common law presumptive right of public access, since that right attaches only to "judicial records," <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 597 (1978), and not all documents filed with a court are considered judicial documents subject to public access. <u>In re Boston Herald, Inc.</u>, 321 F.3d 174, 180 (1ˢᵗ Cir. 2003), citing <u>United States v. Gonzalez</u>, 150 F.3d 1246, 1255 (10ᵗʰ Cir. 1998). A judicial document is one "on which the

-12-

court relies in determining a litigant's substantive rights." <u>Federal Trade Commission v.</u>

<u>Standard Financial Management</u>, 830 F.2d 404, 408 (1st Cir. 1987), citing <u>Anderson v. Cryovac,</u>

<u>Inc.</u>, 805 F.2d 1, 13 (1st Cir. 1986). Those documents which are not used in the adjudicatory

process lie beyond the reach of the public's right of access. <u>Standard Financial Management</u>,

830 F.2d at 404; <u>Globe Newspaper Co. v. Pokaski</u>, 868 F.2d 497, 509 (1st Cir. 1989).

Here, the Examiner's report is not a judicial document subject to the public right of

access. It will not be used to adjudicate the substantive rights of any party or have a part in any

judicial decision-making:

> Documents that play no role in the performance of Article III
> functions, such as those passed between the parties in discovery,
> lie entirely beyond the presumption's reach, and "stand[] on a
> different footing than . . . a motion filed by a party seeking action
> by the court," or, indeed, than any other document which is
> presented to the court to invoke its powers or affect its decisions.

<u>United States v. Amodeo</u>, 71 F.3d 1044, 1050 (2d Cir. 1995)("<u>Amodeo II</u>"). <u>See</u> <u>In re Apex Oil</u>

<u>Co.</u>, 101 B.R. 92, 98 (E.D.Mo. 1989)(the purpose of the disclosure statement, which incorporates

the examiner's report, is not to determine substantive rights but is primarily a source of

information upon which creditors make an informed judgment about the merits of a plan of

reorganization); <u>In re Baldwin United Corp.</u>, 46 B.R. 314, 316-317 (Bankr.S.D. Ohio 1985)

(report does not have the binding effect on the court or a party of those of a special master,

arbitrator, or magistrate). For this reason, this particular role of the examiner has been

characterized as a "civil grand jury." <u>Id.</u>

As described by the Examiner, this report is a "foundation for <u>continued</u> investigation,"

and a blueprint for identifying <u>potential</u> claims. It is a compendium of discovery materials,

albeit accumulated, summarized, and commented on by a quasi-judicial officer. No decision of

-13-

the Bankruptcy Court turns on the contents and findings of the report.  From the outset of the

Chapter 11 proceeding, the old management of the debtor had been displaced.  No reorganization

was ever even planned.  The business was operated solely so it could be sold as a going concern.

The investigation and the report were conducted solely to produce information and legal theories

for the benefit of the debtor's estate – to be acted upon by succeeding functionaries and parties,

but not by the court.  Accordingly, as with discovery materials, see Seattle Times Co. v.

Rhinehart, 467 U.S. 20, 37 (1984), and the proceedings of a criminal grand jury, the report

cannot be considered as a judicial document open to public access.

> II.    **Even If the Report Were a Public or Judicial Record, The Bankruptcy Judge
> Erred in Ordering It Released, Since He Did Not Balance the Presumption of
> Public Access Against Countervailing Interests, and Did Not Exercise His
> Discretion to Impound It if There is a "Genuine Risk of Substantial Harm."**

> > A.    **In Determining Whether to Release a Presumptively Accessible
> > Document, a Court Must Exercise Discretion, By Considering Both
> > The Weight of the Presumption and the Countervailing Interests.**

If the report were a judicial record, then it would be "presumptively" subject to public

inspection.  See In re Boston Herald, Inc., 321 F.3d at 189; United States v. Amodeo, 44 F.3d

141, 146 (2nd Cir. 1995)("Amodeo I").  But this is not the end of the analysis.  A court has

"supervisory power over its own records and files" and must determine whether to release a

particular document using "a discretion to be exercised in light of the relevant facts and

circumstances of the particular case." Nixon, 435 U.S. at 598-99; see also In re Boston Herald,

321 F.3d at 190 and Amodeo II, 71 F.3d at 1048-53.  The source of this power is the court's

common law, inherent authority over its files,[14] as well as 11 U.S.C. §§ 105,[15] and 107(b).[16]  To

exercise its discretion properly, the court must balance the presumption of public access against

countervailing interests.  The weight of the presumption itself is:

> governed by the role of the material at issue in the exercise of
> Article III judicial power and the resultant value of such
> information to those monitoring the federal courts.  Generally, the
> information will fall somewhere on a continuum from matters that
> directly affect an adjudication to matters that come within a court's
> purview solely to insure their irrelevance.

Amodeo II, 71 F.3d at 1049.  "As one moves along the continuum, the weight of the presumption

declines."  Id.  The Local Rule requires the court to consider countervailing interests, i.e.,

whether there exists a "genuine risk of substantial harm."  See MLBR 9018-1(a).  In the Amodeo

cases, the issue was whether to disclose a report made by an officer appointed pursuant to a

consent decree to investigate allegations of corruption within a labor union.  In Amodeo I, the

Court ruled that the report was a judicial document since it was relevant to the Court's decision-

---

[14] See Nixon, 435 U.S. at 598.

[15] "The court may issue any order, process, or judgment that is necessary or appropriate
to carry out the provisions of this title.  No provision of this title providing for the raising of an
issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any
action or making any determination necessary or appropriate to enforce or implement court
orders or rules, or to prevent an abuse of process."  11 U.S.C. § 105(a).

[16] "On request of a party in interest, the bankruptcy court shall, and on the bankruptcy
court's own motion, the bankruptcy court may – (1) protect an entity with respect to a trade
secret or confidential research, development, or commercial information; or (2) protect a person
with respect to scandalous or defamatory matter contained in a paper filed in a case under this
title."  11 U.S.C. § 107(b).

See also In re 50-Off Stores, Inc., 213 B.R.646, 650 (Bankr.W.D.Tex. 1997)("Both the
statute and [Fed.R.Bankr.P. 9018] are similar to the provisions of Rule 26©) which permits a
court to 'make any order which justice so requires to protect a party or person from annoyance,
embarrassment, oppression, or undue burden. . . .'").

making process under the consent decree. 44 F.3d at 146. However, after the district court ordered the release of a redacted version on remand, the Court reversed. It viewed the report as "on the periphery of the adjudicative process," <u>Amodeo II</u>, 71 F.3d at 1051, leading to a weak presumption "because the Report bears only a marginal relationship to the performance of Article III functions." <u>Id.</u> at 1052. Turning to countervailing factors, it considered the potential impairment of law enforcement or the performance of Article III functions, <u>id.</u> at 1050; the privacy interests of the persons seeking impoundment, <u>id.</u> at 1051; and the fact that some parts of the report were hearsay and might contain untrustworthy or incorrect information. <u>Id.</u> at 1051-52. After balancing all of these factors, the Court ruled that one portion of the report should be sealed, and remanded with directions to reconsider the release of the other portion under the proper standards. <u>Id.</u> at 1052.

**B.     The Bankruptcy Judge Employed The Wrong Standard; He Did Not Engage in a Balancing Test and Did Not Consider Whether There <u>Was a Genuine Risk of Substantial Harm</u>.**

The bankruptcy judge held that the only issue for his consideration was whether the movants had proved that the report contained inaccurate information. He arrived at this conclusion by first holding that § 107(b), which requires the court to "protect a person with respect to scandalous or defamatory matter," was limited to information which is not true. Next, while he recognized the court's supervisory power over its records and files, (A. 225), and noted the existence of MLBR Rule 9018-1(a), he held that his discretion was only properly exercised in accordance with his limited view of the § 107(b) power, "because Congress enacted an express statutory scheme," in § 107(b). (A. 226 ). He was in error in both respects and, as a result, failed to exercise his discretion at all.

In the first place, a showing of falsity is certainly not part of the classic definition of "scandalous or defamatory" matter.  In fact, the bankruptcy judge correctly noted that scandalous or defamatory material is material that would cause "a reasonable person to alter their [sic] opinion of [a party] based on the statements contained therein, taking those statements in the context in which they appear."  In re Phar-Mor, Inc., 191 B.R. 675, 679 (Bankr. N.D.Ohio 1995).  See, e.g., Poland & Post Broadcasting Co., 330 Mass. 701, 704 (1953)("Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule, or tend to impair his standing in the community."); Black's Law Dictionary, 7th Edition (1999)(defining defamatory as "[of a statement or communication] tending to harm a person's reputation, usually by subjecting the person to public contempt, disgrace, or ridicule, or by adversely affecting the person's business" and scandalous matter as "a matter that is both grossly disgraceful (or defamatory) and irrelevant to the action or defense").  Whether a statement is defamatory is a different question from whether it is false.  See, e.g., Dulgarian v. Stone, 420 Mass. 843, 847 (1995)(plaintiff must prove both that statements were defamatory and that they were false).

The bankruptcy judge's view thus leads to the illogical and highly impractical proposition that to seal exceedingly prejudicial statements in a preliminary report, a person must prove them false in paper motions filed before the litigation is even begun.  In this case, indeed, the irony is that appellant fails to obtain relief because he has not, at this stage, in emergency motion practice, established the falsity of statements which even the Examiner explicitly conceded may prove to be untrue on further investigation.  Compare, e.g., In re Globe Newspaper Co., 729 F.2d 47, 55 (1st Cir. 1984)(unfairness of requiring movant to establish illegality of interceptions as condition in obtaining impoundment at bail hearing).  Certainly, the

-17-

authorities relied upon by the court do not stand for any such broad proposition, and none deals with the special problem of an interim investigative report.[17/]

More fundamentally, however, there is no suggestion that by providing a mandatory remedy for scandalous and defamatory matter in § 107(b), Congress intended to preempt the court's very well-established common law authority altogether. Indeed, even the bankruptcy judge acknowledged the continued existence of the common law power; instead, he merely declined to exercise his discretion other than under § 107(b) standards. In any event, § 105 expressly authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

As a result of his erroneously limited reading of his powers and responsibilities, the bankruptcy judge never made the required balance of interests and never considered whether, in the words of the Local Rule, disclosure of the report would "present a genuine risk of substantial harm." He did not consider the role – or lack of one – of the Report in the adjudication of substantive rights. He did not consider the countervailing interests. Thus, he did not consider the impact of disclosure upon the ability to obtain the cooperation and candor of witnesses, in

_____

[17/] In In re Continental Airlines, Inc.,150 B.R. 334, 339 (D.Del.1993), the court found that certain portions of the fee reviewer's reports had been improperly sealed under the authority of §107(b) since the factual information contained therein was truthful and not defamatory. The court, however, reviewed the record and found that there was nothing in the record that indicated that the factual portions of the fee reviewer's reports, which had been taken from the fee applicants' own applications and from other parts of the record, contained defamatory statements. Id. In In re Whitener, 57 B.R. 707, 708 (Bankr.E.D.Va. 1986), the debtor sought to expunge his bankruptcy records so that credit bureaus would no longer report that he had discharged his debts in bankruptcy. The court found that his motion invoked §107(b)(2) and denied the motion based on the fact that it was undisputed that the information in the papers on file in the debtor's case was true, i.e., that he had indeed discharged his debts in bankruptcy. Id. at 709.

general.  And, lacking proof of falsity, he declined to consider the possibility of error in the preliminary document.

Nor did he consider how public disclosure would impact on appellant's ability to obtain a fair trial in likely ensuing criminal proceedings in this district.  The closest the bankruptcy judge's Memorandum comes to discussing this issue was the following:

> While the Court is mindful that the disclosure that an individual []
> is a potential criminal defendant may taint the pool of prospective
> jurors, many of the individuals advancing such argument are
> already defendants in a civil action pending in the United States
> District Court for the District of Massachusetts (Civil Action #04-
> 12227-DPW) where the allegations are substantially similar to
> information which the Examiner was told and included within the
> Report.

(A. 227).  This, of course, is true, but irrelevant.  Appellant is not complaining about being identified as a potential criminal defendant.  Rather, his concern is with the effect of disclosure of highly prejudicial allegations of fact <u>and</u> conclusions, <u>in the report of a judicial officer</u> appointed by the court to conduct an investigation and make a report.

> **C.    An Exercise of Discretion Under the Appropriate Standards Would
> <u>Have Led to Impoundment of the Report.</u>**

If the Bankruptcy Court had observed the proper standards, and exercised its discretion under them, it would have ordered the report sealed.  Appellant has argued above that the report was not a judicial record at all.  But if it were, it had even more of a "marginal relationship" than the report in <u>Amodeo</u>, and, thus, there was an even less weighty presumption.  On the other side of the balance are all the factors cited by the <u>Amodeo</u> court, and more.  First, there is the risk to the defendant's fair trial rights, which is the <u>weightiest</u> of interests, since "[n]o right ranks higher than the right of the accused to a fair trial."  <u>Press-Enterprise Co. v. Superior Court of California</u>,

-19-

464 U.S. 501, 508 (1984). <u>See</u> <u>Gannett Co. v. Pasquale</u> 443 U.S. 368, 378 (1979)("To safeguard

the due process rights of the accused, a trial judge has an affirmative constitutional duty to

minimize the effects of prejudicial pretrial publicity."). It is well-known that appellant is the

target of an ongoing federal investigation. It is not an exaggeration to say that publication of the

report would poison the atmosphere and irreparably impair appellant's ability to obtain a fair

trial.

Release of the report would be especially problematic in that – despite its real function as

a repository of discovery material – it is authored by a quasi-judicial officer and will appear to

have the imprimatur of the court. It should be obvious that the conclusions of a judicial officer

are profoundly different from the allegations of an interested party in terms of the harm they

would inflict on the fair trial prospects of appellant. The fact that the officer has hedged his

conclusions with numerous caveats, based on the preliminary and incomplete nature of his

investigation, should not be taken as a reason for appellant not to worry – as suggested by the

bankruptcy judge (A. 228-30). On the contrary, the concededly interim, tentative, one-sided, and

hearsay nature of the Examiner's work product establishes a compelling reason not to disclose,

precisely as the Examiner has argued himself in the past. (A. 167).

Similar to the judicial documents the newspaper company sought in <u>In re Globe</u>

<u>Newspaper Company,</u> 729 F.2d at 58, the Examiner's report contains "untested" material in the

form of hearsay and raw investigatory information that, if publicized, would clearly cause

irreparable damage before Appellant has had an opportunity to challenge that information. <u>See</u>

<u>also</u> <u>Amodeo II</u>, 71 F.3d at 1050 (court should not readily disclose raw, unverified information

and should consider whether the nature of the materials is such that there is a fair opportunity for

the subject to respond to any accusations contained therein).  At this stage, the fair trial interests

of appellant are at their zenith, especially if one considers the seriousness of the allegations

against him, the intense publicity that the release of the Examiner's Report would generate, and

the extremely prejudicial material to which the press seeks access.  In re Globe Newspaper Co.,

729 F.2d at 59.

Moreover, as in Amodeo, even beyond appellant's concerns, the court has a strong

institutional interest in preserving the integrity of the Examiner's investigative process, as the

Examiner argued prior to his recent change of course:

> Nor does the fact that the Examiner's efforts may shortly be
> concluded eliminate the need for secrecy.  "[T]he interests in grand
> jury secrecy, although reduced, are not eliminated merely because
> the grand jury has ended its activities."  Globe Newspaper Co. v.
> Pokaski, 868 F.2d 497, 510 (1ˢᵗ Cir. 1989), quoting Douglas Oil
> Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 (1979).
> Similarly, the interests of the Examiner in secrecy are not
> eliminated when his activities have ended.  This is particularly true
> in this context as the Report in question is an interim report.  The
> findings of the Examiner are not final; the Examiner's
> investigation, whether it is carried on by the Examiner, LaSalle
> Bank, the United States Trustee's Office or the Creditors'
> Committee, will be continued.  Some of the preliminary findings of
> the Examiner's Report related to third parties may be shown to be
> incorrect and it could be grossly unfair to those third parties to
> have the Examiner's preliminary findings published in the
> newspapers and naturally interpreted as final.  Moreover, it is
> equally inappropriate to identify at this time the parties who are
> cooperating with the Examiner in the preparation of his interim
> Report as those parties, with the bright light of publicity shown
> upon them, may become more reticent about taking to the
> Examiner or subsequent investigators.

(A. 167).

-21-

Although the Examiner has reversed course on appeal, nothing has occurred to affect the accuracy and strength of the reasons he previously expressed for opposing disclosure.[18] Indeed, just as with a criminal grand jury process, secrecy is needed both to encourage witnesses to cooperate fully and to protect the subjects of the process whom, at the end of the investigation, may well be vindicated. See, e.g., Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 (1979).

### III.    There Is No First Amendment Right of Public Access to the Examiner's Report.

There is no First Amendment right of access to the report. While the Supreme Court has recognized a qualified First Amendment right of access to criminal proceedings and records, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), it has so far not extended this principle to non-criminal cases. See In re Providence Journal Co., 293 F.3d 1, 10 n.4 (1st Cir. 2002). And, of course, it does not apply to documents which are not judicial records. See In re Boston Herald, Inc., 321 F.3d at 184.

But even if the First Amendment right extended to bankruptcy proceedings and records, it would not require disclosure of this report. Where applicable, the First Amendment test considers whether, in respect to a particular type of document or proceeding, there has been a "tradition of accessibility," Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 8 (1986), and whether, "public access plays a significant positive role in the functioning of the

---

[18] Unfortunately, the Examiner now seems to view his function, on appeal, as merely to articulate the views of the bankruptcy judge to whom he reports. See Examiner's Opposition to Appellant's Emergency Motion for Stay of the Bankruptcy Court's Order of February 9, 2005 Releasing the Report of the Examiner. Hopefully, it will not be considered too unkind to point out that the Examiner's very substantial bills are now pending for approval before the Bankruptcy Court. See Docket Nos. 552 and 553.

particular process in question.  Id.  Then, even if these tests produce affirmative results, the

document may still be impounded if there is an "overriding interest."  Id. at 9; see also In re

Boston Herald, 321 F.3d at 182.

As to the history prong of the test, there is hardly a long-tradition of openness, as that

concept has been applied by the courts.  In Anderson v. Cryovac, Inc., 805 F.2d 1 (1st Cir. 1986),

for example, where the movant sought disclosure of documents submitted to the court in

connection with discovery motions, the First Circuit noted that "[t]he pretrial discovery process

is a fairly recent invention," id. at 12, tracing it back to the 1938 enactment of the federal rules.

Compare, for example, the history of access to alphabetical indices of closed criminal files in

Globe Newspaper Co. v. Benton, 819 F.Supp. 89 (D.Mass. 1993)(accessible since pre-

Revolutionary times).  The appointment of an Examiner's investigation has even a shorter

pedigree; prior to the 1978 Bankruptcy Reform Act, it was rarely available.  See note 6, supra.

Moreover, in this context it is important to distinguish between different types of investigations

conducted by an examiner.  As appellant noted above, an investigation conducted solely to

produce discovery for the estate beneficiaries is itself a relatively infrequent subset of the

process.  It is doubtful that whatever has been done with this class of reports in the past could

constitute a sufficient "tradition" of public access to support the recognition of a constitutional

right.  Furthermore, as the First Circuit noted in In re Boston Herald, where experience is of

relatively recent vintage, one looks to the treatment of analogous documents or proceedings.  321

F.3d at 184.  Here, the closest analogy would be the collection of raw discovery materials on

which no judicial decision turns.  There is no doubt that there is no tradition of public access to

this information.  See Seattle Times Co. v. Rhinehart, 467 U.S. at 33; Anderson v. Cryovac, Inc.,

805 F.2d at 13.

Turning to the question of what role public access would play, the claims for disclosure founder once again on the fact that no judicial decision turns on the report.  The so-called "logic" prong of the test focuses on whether public monitoring plays a positive role in the functioning of the judicial process.  See In re Boston Herald, 321 F.3d at 182.  Obviously, where the document is not material to judicial decision-making at all, public access cannot play a positive role in it. On the other, hand, exposure of this report to the public would actually frustrate the goals of the examiner process as well as actual judicial functions, including, especially, the ability to provide a fair trial to the appellant.  These considerations are outlined above in connection with the common law issue and apply with equal force against the First Amendment claim.

Finally, even if there were a presumptive First Amendment right, the appellant's right to a fair trial would constitute an overriding factor.  See In re Providence Journal Co., 293 F.3d at 14 ("the defendant's trial rights represent a compelling interest"); see also Press-Enterprise Co. v. Superior Court of California, 464 U.S. at 508; Gannett Co. v. Pasquale 443 U.S. at 378.

## CONCLUSION

For the reasons set forth above, the appellant requests that the Court reverse the

Bankruptcy Court's decision to release the Examiner's report to the public.

Respectfully submitted,

Max D. Stern
BBO No. 479560
Lillian Hirales
BBO No. 652698
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114

Dated: March 2, 2005

G:\SSWG\Gitto\Gitto-Global Bankruptcy\Impoundment Appeal\Appeal brief.wpd

-25-

*United States Bankruptcy Court*
*District of Massachusetts*

IN RE                                              CHAPTER 11
                                    :
GITTO/GLOBAL CORP.,                 :              CASE 04-45386
DEBTOR_____:

## MEMORANDUM OF DECISION WITH RESPECT TO FURTHER ORDER
## REGARDING REPORT OF CHAPTER 11 EXAMINER

Following this Court's Order of December 9, 2004 [Docket # 344] granting the

Amended Motion to Seal Examiner's Preliminary Report [Docket # 332], the issue of

sealing all or redacting portions of the Examiner's Report again came before the Court

on various pleadings filed by several parties in interest seeking access to the

Examiner's Report and by some parties urging that publication of the Report be limited.

The Examiner opposed providing access to his "preliminary" Report; other parties

opposed the request by members of the press for access to the Report.  After the

hearing on these sundry pleadings, the Court issued its Order Regarding the Report of

the Examiner [Docket # 416] ("Order of January 5, 2005") whereby the Examiner's

Report would be filed under seal with the Court.  In addition the Examiner was ordered

"to provide each person named in the report, or referenced in such a fashion that the

Examiner reasonably believes such person could be identified, with a copy of **only** that

portion or portions of the report that relate to the individual."  Order of January 5, 2005

at ¶ 2.  The same order also established a procedure whereby those parties seeking to

seal all or redact portions of the Report would file motions requesting such relief in

compliance with applicable law.

In accordance with the Order of January 5, 2005, the Examiner filed his Report under seal with the Court on January 7, 2005 [Docket #506] and timely served copies of the relevant part or parts of the Report relating to individuals or entities upon those respective recipients. In all the Examiner served approximately 120 individuals or entities. In response the Court received numerous pleadings that fall into two categories: motions to seal or redact portions of the Report and motions for access to the Report. The former number approximately 26 but some seek to shield the same individuals and entities named in the Report.[1] The latter include motions, some of which were combined with oppositions to the motions to seal, by the Official Committee of Unsecured Creditors ("Creditors' Committee"),[2] the United States Trustee, the

---

[1] Many of the motions to impound failed to comply with the Massachusetts Local Bankruptcy Rules. Some motions sought to protect the name of the individual named in the Report but identified the individual in the very motion or caption of the motion to seal which was then filed not under seal and, in some cases, filed electronically by counsel. The Court did endeavor to protect movants from their own actions and treated motions to seal that contained information the movants hoped would be kept from the public as if those motions had been properly filed under seal. Suffice it to say that the motions seeking to seal or redact the Report, taken as a group, show an overwhelming lack of understanding of the procedure for seeking impoundment to say nothing of the substantive burden which parties requesting such a remedy must bear. Parties, especially counsel, are cautioned to familiarize themselves with the procedure for requesting impoundment. In the future the Court may not be inclined to protect movants who ignore the local rules. Moreover as a result of the orders which the Court will issue in connection with this Memorandum of Decision, improperly filed motions will be imaged. In the end the Court cannot and will not ignore its obligations to make available all documents not filed under seal.

[2] The Creditors' Committee is entitled to access to the Report or a summary of the Report as a matter of law. Section 1106(a)(4) of the United States Bankruptcy Code, 11 U.S.C. § 1106(a)(4), made applicable to examiners by section 1106(b), provides that an examiner "shall ... (A) file a statement of any investigation conducted [by the examiner] ...; and (B) transmit a copy or a summary of any such statement to any creditors' committee ...."

Debtor, LaSalle Business Credit LLC, and ORIX Financial Services, Inc., each

requesting that it or she be given a complete copy of the Report even if the Report is

not to be published generally.  The press, in their opposition to the motions to seal,

seek unfettered access to the Report on behalf of the public.[3]

    The Court has reviewed all of the motions to seal, oppositions thereto, motions

for access to the Report, all pleadings related to the foregoing, and the Report along

with all of its exhibits.  The Court also held a hearing on these matters and the parties

were given an opportunity to raise new arguments[4] in support of their cause or in

opposition to an opposing position.

## DISCUSSION

    Whether some or all of the Report should be sealed and whether parties (with

---

[3]Worcester Telegram & Gazette Corporation ("T&G") and MediaNews Group,
Inc. filed motions to intervene to which some objections were filed.  "[C]ourts must
determine on a case by case basis whether the prospective party in interest has a
sufficient stake in the proceeding so as to require representation.  *See In re Penn-Dixie
Industries, Inc.*, 9 B.R. 941, 943 at n. 7 (Bankr. S.D.N.Y.1981)."  *In re Amatex Corp.*,
755 F.2d 1034, 1042 (3d Cir. 1985).  The newspapers easily meet this test.  "The press
has standing to intervene in actions to which it is otherwise not a party in order to
petition for access to court proceedings and records.  *Petition of Tribune Co.*, 784 F.2d
1518, 1521 (11th Cir.1986) (citing *Newman v. Graddick*, 696 F.2d 796, 800 (11th
Cir.1983))."  *In re Apex Oil Co.*, 101 B.R. 92, 95-96 (Bankr. E.D.Mo. 1989).  *See also In
re Ionosphere Clubs, Inc.*, 156 B.R. 414, 431(S.D.N.Y. 1993).  Moreover intervention is
"the procedurally correct course" for third-party challenges to protective orders.  *In re
Beef Industry Antitrust Litigation*, 589 F.2d 786, 789 (5th Cir.1979), *cited with approval
Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 783-84 (1st Cir. 1988), *cert. denied*
488 U.S. 1030, 109 S.Ct. 838 (1989).  Therefore separate orders granting the motions
to intervene and overruling the objections will enter.


[4]Because the Court reviewed each of the relevant pleadings and because many
of the arguments advanced in favor of sealing all or part of the Report are substantially
similar, the Court asked parties or counsel to limit their oral presentations to arguments
not raised in their written submission.

the exception of the Creditors' Committee which has a statutory entitlement to at least a summary of the Report) should be given access, or limited access, to the Examiner's Report are intertwined.  They are two sides of the same coin.

**The Nature of the Examiner's Report**

Many of the parties, relying on *Matter of Baldwin United Corp.*, 46 B.R. 314 (Bankr. S.D. Ohio 1985), urge the sealing of the Report on the grounds that an examiner enjoys a unique status in a bankruptcy; his role is akin to a civil grand jury. These movants correctly note the *Baldwin* court agreed with the examiner's characterization of his investigative responsibilities "to ascertain legitimate areas of recovery and appropriate targets for recovery" as akin to the function of a civil grand jury and concluded that if an examiner's disinterested and nonadversarial role is to be preserved, all examiners "and the subjects of their investigation must be unhampered by the threat that any information which comes into the Examiner's hands will be fair game for a plethora of anxious litigants, regardless of the limitations on disclosure which the Bankruptcy Court has imposed." *Id.* at 317.  *Baldwin*, however, unlike the instant controversy, involved efforts by plaintiffs in a security class action pending against the debtor to require the examiner "to preserve all documents and other investigative materials" which the examiner acquired during his investigation.  The court viewed this request as the plaintiff's attempt to circumvent the usual course of discovery.  Moreover the order delineating the *Baldwin* examiner's responsibilities contained the following language:

> ORDERED, that except as otherwise ordered by the Court
> after notice and a hearing, nothing contained herein shall

4

> require the Examiner to disclose to any person the
> Examiner's statement of investigation, or any part thereof,
> *prior to filing such statement* pursuant to Section 1106(a)(4)
> of the Bankruptcy Code. Except as otherwise ordered by the
> Court after notice and a hearing, the Examiner shall not be
> required to disclose to any person, other than the Debtors,
> the Securities and Exchange Commission and any official
> committee of creditors or equity security holders appointed
> in these cases, *the information reviewed in connection with
> his investigation....*

Id. at 315 (emphasis added). To cite *Baldwin* for the proposition that an examiner's

report must be sealed in all cases, or even to suggest that the examiner's *statement* in

Balwin was sealed mischaracterizes the *Baldwin* court's decision.

The distinction between an examiner's statement and the investigative materials

underlying that statement is an important one. The statement is *filed* with the Court;

underlying documents supporting the statement are not required to be filed. 11 U.S.C.

§ 1106(a)(4)(A).[5] Papers filed become part of the universe of paper that is

presumptively available for inspection by the public. 11 U.S.C. § 107; *In re Apex Oil

Co.*, 101 B.R. 92, 98 (Bankr. E.D.Mo. 1989) ("The plain language of § 107 establishes

standards only for those documents *which are filed with the court*.") (emphasis in the

original). Because there is nothing in the language of sections 107 or 1106(a)(4) that

suggests that section 107 is inapplicable to an examiner's report, once an examiner's

report is "filed" with the Court, it becomes "a paper filed with the court" and thus falls

within the scope of Bankruptcy Code section 107 and Fed. R. Bankr. P. 9018.

---

[5]In the instant case many of the underlying documents have been filed as
exhibits to the Report and therefore those documents must be treated differently from
materials in the Examiner's possession that he chose not to include.

**Section 107, Rule 9018, and the Sealing of Papers**

Section 107: Public access to papers, provides as follows:

(a) Except as provided in subsection (b) of this section, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

(b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may--

(1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
(2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

Section 107 of the Bankruptcy Code *requires* the sealing of "papers" if (1) requested by a party in interest *and* (2) the information falls within the categories set forth in section 107(b)(1) and (2).  Section 107(b)(1) is not relevant to the Court's present inquiry.  Rather it is the allegations that material contained in the Report is scandalous or defamatory that drive the motions to seal.[6]

Rule 9018[7] of the Federal Rules of Bankruptcy Procedure does not expand the

---

[6]The Court includes in this category even those motions which do not cite section 107(b)(2) or its language as the basis for impoundment but simply ask that the Report be sealed for reasons that do not rise to the level of injury contemplated by section 107(b)(2) or indeed cite no reasons at all.  These flaws are dealt with in when discussing the burden imposed by section 107.

[7]Rule 9018 provides:

On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial

6

Court's ability to limit access to papers filed. It does not provide the movants a separate basis for relief. Similarly MLBR 9018-1(a), which gives the Court discretion to seal documents "[f]or cause reflecting a genuine risk of substantial harm," does not create a new and lower standard for parties seeking impoundment.[8] MLRB 9018-1(a) reiterates that the Court has the power to seal part or all of a pleading if permitted to do so by the Bankruptcy Code or the common law.

Because all papers filed with the Court are presumptively available for inspection by the public, the party seeking to seal or redact papers filed bears the burden of proof. It is not an easy burden nor should it be. The burden has been described in a variety of ways. The party seeking impoundment must submit "evidence that filing under seal outweighs the presumption of public access to court records." *In re Muma Services Inc.*, 279 B.R. 478, 485 (Bankr. D.Del. 2002) ("In the absence of any such evidence, we cannot conclude that disclosure of the terms of the lease would cause harm."). It is a determination based upon the totality of the circumstances. *Phar-Mor, Inc. v.*

---

information, (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code, or (3) to protect governmental matters that are made confidential by statute or regulation. If an order is entered under this rule without notice, any entity affected thereby may move to vacate or modify the order, and after a hearing on notice the court shall determine the motion.

[8]Bankruptcy Rule 9029 permits district courts to adopt local rules governing bankruptcy procedure provided that such rules are not inconsistent with the Bankruptcy Rules. Local Rules that are in conflict with either the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure can have no effect. *In re Falk*, 96 B.R. 901 (Bankr.D. Minn.1989). A local rule may not "abridge, enlarge, or modify any substantive right" nor adopt a procedure inconsistent with that contemplated by the Federal Rules of Bankruptcy Procedure. *Id.* at 904.

7

*Defendants Named Under Seal (In re Phar-Mor, Inc.)*, 191 B.R. 675, 678 (Bankr. N.D. Ohio 1995) ("If the § 107(b) exceptions are applicable, the inquiry must shift to whether Defendants have shown *cause* to invoke an exception, given the totality of the circumstances here found.")  Good cause is not an element of section 107.  *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir.1994)

That information might "conceivably" or "possibly" fall within a protected category is not sufficient to seal documents.  Material must, at the very least, be "likely" to fall within the protected categories.  *United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 150 B.R. 334, 340 (D.Del.1993).  Although it is not a case decided under section 107, the First Circuit's pronouncements in *FTC v. Standard Financial Management Corp.*, 830 F.2d 404, 412 (1st Cir. 1987), support the conclusion that a party requesting the impoundment or redaction of information must make a sufficiently particularized showing for the Court to determine that the allegedly offending information falls within the ambit of section 107.  ("We decline to accept conclusory assertions as a surrogate for hard facts.  In the absence of some compendium of chapter and verse–a demonstration that cognizable harm is lurking in the background–the appellants' orotund protests avail them naught.  We continue to believe that '[a] finding of good cause' to impound documents must be based on a particular factual demonstration of potential harm, not on conclusory statements.'").

For purposes of section 107(b) and Rule 9018, scandalous or defamatory material has been defined as material that would cause "a reasonable person to alter their [sic] opinion of [a party] based on the statements therein, taking those statements

in the context in which they appear." *In re Phar-Mor, Inc.*,191 B.R. at 679 (citation

omitted). If the information is true, it cannot be scandalous or defamatory. *In re*

*Continental Airlines, Inc.*,150 B.R. at 339. "The dissemination of truthful matter cannot

be enjoined merely because the matter is prejudicial; section 107(b)(2) requires that the

matter be scandalous or defamatory." *In re Whitener*, 57 B.R. 707, 709 (Bankr. E.D.Va.

1986). Moreover information that is prejudicial or embarrassing is not necessarily

scandalous or defamatory. *Id.* *See also Clark v. Pearson (In re Hope)*, 38 B.R. 423,

424- 25 (Bankr. M.D. Ga. 1984); *In re Analytical Systems, Inc.*, 83 B.R. 833, 836

(Bankr. N.D. Ga. 1987).

Protection granted pursuant to section 107(b)(2) and Rule 9018 is not

coextensive with that which the Court may grant under Rule 26(c) of Fed. R. Civ. P.

Rule 26(c) gives courts discretion to issue protective order to protect person "from

annoyance, embarrassment, oppression, or undue burden or expense...." But

discovery documents, or perhaps more accurately documents proposed to be

discovered, are not papers filed with a court. Thus the cases in which courts have

granted relief under Fed. R. Civ. P. 26(c) are inapplicable.

**Common Law Right to Access to Judicial Documents**

"It is clear that the courts of this country recognize a general right to inspect and

copy public records and documents, including judicial records and documents." *Nixon*

*v. Warner Communications, Inc.*,  435 U.S. 589, 597, 98 S.Ct. 1306, 1312 (1978). The

presumption that the public has a right to access records exists in civil proceedings.

*FTC v. Standard Financial Management Corp.*, 830 F.2d at 408 n. 4. The presumption

includes "materials on which the court relies in determining the litigants' substantive

rights" but does not include discovery materials.  *FTC. v. Standard Financial*

*Management Corp.*, 830 F.2d at 408 (holding that personal financial statements upon

which the court relied in approving a settlement should be accessible to the public).[9]

"It is uncontested, however, that the right to inspect and copy judicial records is

not absolute.  Every court has supervisory power over its own records and files, and

access has been denied where court files might have become a vehicle for improper

purposes."  *Nixon v. Warner Communications, Inc.*,  435 U.S. at 598.  Denial of

common law right to access documents is left to the sound discretion of the court.

*Nixon v. Warner Communications, Inc.*,  435 U.S. at 598.

The First Circuit has described the test for determining whether documents to

which the common law right to access attaches as follows:

> We agree with the Sixth Circuit that only the most
> compelling reasons can justify the non-disclosure of judicial
> records....When faced with a claim that cause sufficiently
> cogent to block access has arisen, it falls to the courts to
> weigh the presumptively paramount right of the public to
> know against the competing private interests at stake....This
> balance must be struck, of course, in light of the relevant
> facts and circumstances of a particular case....The
> objectors—those seeking to keep the datum hidden from
> view—must carry the devoir of persuasion.

*FTC v. Standard Financial Management Corp.*, 830 F.2d at 410 (internal quotations and

citations omitted).  As the Massachusetts Local Bankruptcy Rules describe the test, a

---

[9]As with section 107 the distinction between papers filed with the Court, *i.e.*,
judicial records, and documents that are not filed is important.  Private "documents
collected during discovery are not judicial records."  *United States v. Anderson*, 799
F.2d 1438, 1441 (11th Cir.1986).

party seeking impoundment must demonstrate "a genuine risk of substantial harm."
MLBR 9018-1(a).

It is important to remember that the cornerstone of the common law upon which many of the parties seeking impoundment rely is that all judicial documents are open to the public. Although the test for impoundment is expressed in words that do not parallel the language of section 107 of the Bankruptcy Code, the sound discretion of a bankruptcy court to seal documents under the common law should mirror its discretion to seal documents under section 107(b). "Because Congress enacted an express statutory scheme, issues concerning public disclosure of documents in bankruptcy cases should be resolved under § 107. *In re Continental Airlines*, 150 B.R. 334 (D.Del.1993)." *In re Phar-Mor, Inc.*, 191 B.R. at 679.

In the final analysis whatever rubric is employed, each party seeking to limit the public's right to access has a heavy burden. He must come forward with the particular facts that demonstrate the material at issue is scandalous or defamatory.

The Court is well aware of the facts of this case and has read the Report and all exhibits thereto. It has reviewed the material in light of the controlling law, the positions of the various parties, and indeed, scrutinized the materials to determine whether part or all of the Report and its exhibits should be sealed and now turns to the motions to seal.

**Have the parties seeking impoundment or redaction met their burden of proof?**

At the outset, some comments about the level of proof proffered to the Court are warranted. In almost all instances there was no proof. Some motions do not even allege that the information that they state "should" be sealed was defamatory or

11

scandalous.  Their proponents instead urged redaction of any information relating to

them because they did not want to be mentioned in the Report.  Others alleged that

their mere inclusion within the Report was sufficient to cause them harm; for example

some employees or former employees did not want the fact of their employment by the

Debtor published.  Still others urged that the Court not divulge to the public information

about them even though they do not allege that information contained in the Report that

is relevant to them is factually inaccurate.  Still others seek to shield themselves from

public knowledge that they did not or would not speak with the examiner, including

those individuals who properly invoked their privilege against self-incrimination.  While

the Court is mindful that the disclosure that an individual who is a potential criminal

defendant may taint the pool of prospective jurors, many of the individuals advancing

such argument are already defendants in a civil action pending in the United States

District Court for the District of Massachusetts (Civil Action # 04-12227-DPW) where the

allegations are substantially similar to information which the Examiner was told and

included within the Report.

In the final analysis, each of the motions to seal fall short- often far short, of the

mark.  Discomfort, embarrassment, shame, and remorse do not rise to the level of

scandalous or defamatory.  The Examiner took great pains to be inclusive yet even-

handed.

**The Court's Discretion to Seal or Redact the Report**

In conducting its own analysis, the Court concludes that there is nothing

scandalous or defamatory in the Report.  The bank account numbers, however, may

properly be considered confidential information and therefore the Examiner is instructed

to delete all bank account numbers included in the Report and its exhibits.  With this one exception, the Court will not redact portions of the Report *sua sponte.*

The Court, however, is not unmindful or unsympathetic to the concerns that the Report will be mischaracterized, that information in the report will be misconstrued and interpreted as having the imprimatur of this Court.  Many expressly fear that the press will leap to unsubstantiated conclusions of guilt and will broadcast the same.  To be clear, the Report is not a document that has the blessing of this Court.  It is, as the Examiner notes, a report of his investigation into the affairs of the Debtor and his suggestions for further areas of inquiry.  It is one-sided in that the very people sometimes painted in an unflattering light did not respond to the Examiner's inquiries or to the allegations made by others.  Some were advised by counsel not to respond; some were not permitted by counsel to respond; some appear to have chosen not to respond out of fear.

So that there is no doubt, the Court cautions all parties who will be given access to the Report, in the words of the Examiner, as to what the report is and what it is not.

> [I]n many instances, the Examiner reports herein statements, often hearsay, which the Examiner has been unable to confirm independently, and with respect to which nobody has told "the other side of the story...."  Given the nature of this Report, and the fact that others are likely to continue the Examiner's investigation, it seemed appropriate to include such statements, not so they would be assumed to be fact, but so they could be further investigated and not

13

forgotten. In other instances, the Examiner did solicit and receive responses from parties who were the subject of allegations made by others or reviewed documents that supported such statements. The Examiner has attempted to present its findings in the most balanced manner possible under the circumstances. Inevitably, though, the selection of which statements are discussed or relied on herein required the exercise of judgment by the Examiner. Continued investigation may lead to evidence which supports or contradicts those statements.

***

A final note to the reader: other than those of the Gitto Principals themselves, the names most often mentioned in this Report are those of the persons who cooperated with the Examiner, told the Examiner what they remembered, and, in doing so, put themselves at risk of civil or perhaps even criminal sanction. The frequency with which a particular person's name appears, therefore, should not necessarily lead one to conclude that such person directed or profited from the activities detailed [in the Report].

***

The Examiner does note a fundamental distinction between the employees discussed herein and the Gitto Principals

14

themselves.  In contrast to the significant evidence that the
Gitto Principals personally profited from the misconduct
described herein, the Examiner has not been provided with
any evidence that suggests the employees (with certain
possible exceptions noted below) received compensation
specifically for their participation.  The motivation of most of
the employees appears to have been simply to stay in good
standing as employees of Gitto Global.  Further it is doubtful
that all of the employees fully grasped the scale of the
fraudulent acts being carried out and the economic stakes of
the Gitto Principals' misconduct.

***

The Examiner's task was [to] investigate "the existence of
any prepetition fraud, dishonesty, incompetence,
misconduct, mismanagement or irregularity in the
management and business affairs of the Debtor."  Many
unanswered questions remain as of the filing of this Report.

***

Substantial additional investigation is required into the areas
identified in this Court's order appointing the Examiner
before definitive determinations can be made as to whether
the Debtor's estate holds claims against certain other
parties....

15

Examiner's Report at 22-23, 128, and 153.

Moreover, to the extent that the press has sought a determination that some or all of the individuals named in the Report are public figures, limited public figures, or quasi-public figures, the Court denies those requests. The press is aware of its responsibilities and the Court again cautions that it expects all parties will be thoughtful in their use and dissemination of the Report and the information contained therein.

**Constitutional Right to Access**

Finally, although members of the press such as the Worcester Telegraph & Gazette argue that they have a constitutional right to see the Report, the cases that hold that there is a First or Fourteenth Amendment right to access are *criminal* cases. The Court is unaware of civil cases that rest upon a finding that public access to pleadings in a civil cases is constitutionally required and in light of the Court's decision, there is no need for the Court to explore whether such a constitutional right should be found to exist.

**CONCLUSION**

For the reasons set forth herein, the motions to seal are DENIED. The Report shall be made available to all parties and to the public. The motions for access are thus MOOT.

Separate orders shall issue.

Dated: February 9, 2005

Joel B. Rosenthal
United States Bankruptcy Court

16