# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:* | ) |
| | ) |
| **GITTO GLOBAL CORPORATION,** | )     CHAPTER 11 |
| | )     Case No. 04-45386 JBR |
| DEBTOR. | ) |
| | ) |
| | ) |
| | ) |
| GARY GITTO, | ) |
| | ) |
| Appellant, | )     **APPEAL** |
| | )     **No. 05-cv-10334 DPW** |
| v. | ) |
| | ) |
| WORCESTER TELEGRAM & GAZETTE | ) |
| CORP., MEDIANEWS GROUP, INC., | ) |
| CHARLES L. GLERUM, EXAMINER, | ) |
| and PHOEBE MORSE, UNITED STATES | ) |
| TRUSTEE | ) |
| | ) |
| Appellees. | ) |
| | ) |

---

## BRIEF OF APPELLEE WORCESTER TELEGRAM & GAZETTE CORPORATION

---

Jonathan M. Albano BBO # 013850
Rachael Splaine Rollins BBO # 641972
Aaron Michael Wais BBO # 651445
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000
Attorneys for Appellee Worcester
Telegram & Gazette Corporation

## CORPORATE DISCLOSURE STATEMENT

The Worcester Telegram & Gazette Corporation is a wholly owned subsidiary of The New York Times Company, a publicly held company.

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................................................. 1

STATEMENT OF THE CASE.................................................................................... 1

    A.    Procedural History ........................................................................................ 1

    B.    Statement of Facts ....................................................................................... 4

SUMMARY OF ARGUMENT ................................................................................... 6

ARGUMENT ............................................................................................................ 7

    A.    Standard of Review ..................................................................................... 7

    B.    The Bankruptcy Court Correctly Ruled The Examiner's Report is Presumptively Public Under Section 107 of the Bankruptcy Code........................ 7

    C.    The Bankruptcy Court Correctly Ruled That Section 107(b)(2) of the Bankruptcy Code Did Not Justify Sealing the Examiner's Report............................ 10

    D.    The Bankruptcy Court Correctly Ruled That the Public Has a Common Law Right of Access to the Examiner's Report.......................................... 12

            1.    The Nature of an Examiner's Duties Support a Finding that the Common Law Right of Access Applies to His Report. ............................. 14

    E.    The Bankruptcy Court Correctly Ruled That Appellant Failed To Make A Particularized Showing Sufficient To Justify Sealing The Examiner's Report........................................................................................................ 19

    F.    The Public Has a First Amendment Right of Access to The Examiner's Report........................................................................................................ 22

CONCLUSION......................................................................................................... 27

## TABLE OF AUTHORITIES

### FEDERAL CASES

Air Line Pilots Association, International v. America National Bank and Trust Co.
    (In re Ionosphere Clubs, Inc.), 156 B.R. 414 (S.D.N.Y. 1993) .................................8, 9, 17

Anderson v. Cryovac, Inc., 805 F.2d 1 (1st Cir. 1986).......................................12, 19, 23

Baltimore Sun Co. v. Astri Investment Management & Sec. Corp. (In re Astri
    Investment Management & Sec. Corp.), 88 B.R. 730 (D. Md. 1988) ....... 14, 15, 16, 18-19

Cameron v. United States, 231 U.S. 710, 34 S. Ct. 244 (1914).....................................14

Dorn v. Astra USA, 975 F. Supp., 338 (D. Mass. 1997) ..............................................32

F.T.C. v. Standard Finance Management Corp., 830 F.2d 404 (1st Cir. 1987)...7, 11-12, 20-21,24

First America Health Care of Ga., Inc. v. U.S. Department of Health and Human
    Services, 208 B.R. 992 (Bankr. S.D. Ga. 1996) ...................................................17

Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982) .........................22, 24, 25

Globe Newspaper Co. v. Pokaski, 868 F.2d 497 (1st Cir. 1989)...............................23, 26

Hartford Courant Co. v. Pellegrino, 380 F.3d 83 (2d Cir. 2004).....................................23

In re Apex Oil Co., 101 B.R. 92 (Bankr. E.D. Mo. 1989) .........................................8, 9

In re Continental Illinois Sec. Litigation, 732 F.2d 1302 (7th Cir. 1984) .................. 23-24

In re GHR Energy Corp., 33 B.R. 451 (Bankr. D. Mass. 1983)......................................18

In re Gilman Services, Inc., 46 B.R. 322 (Bankr. D. Mass 1985) ...................................17

In re Keene Corp., 164 B.R. 844 (Bankr. S.D.N.Y. 1994) ...........................................17

In re Matter of Baldwin United Corp., 46 B.R. 314 (Bankr. S.D. Ohio 1985)................9

In re Nunn, 49 B.R. 963 (Bankr. E.D. Va. 1985) .......................................................11

In re Prussian, 255 F. 857 (E.D. Mich. 1919)...........................................................15

In re Recoton Corp., 307 B.R. 751 (Bankr. S.D.N.Y. 2004)....................................14, 18

In re Symington, 209 B.R. 678 (Bankr. D. Md. 1997) ............................................ 13-15, 18, 21

In re Vance, 176 B.R. 772 (Bankr. W.D. Va. 1995)....................................................................18

In re Whitener, 57 B.R. 707 (Bankr. E.D. Va. 1986) ...............................................................10

Joy v. North, 692 F.2d 880 (2d Cir. 1982).................................................................................23

Lamie v. United States Trustee, 540 U.S. 526, 124 S. Ct. 1023 (2004) .................................8

Mu'Min v. Virginia, 500 U.S. 415 (1991) ...............................................................................20

NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated
    Telecom Express, Inc.), 384 F.3d 108 (3d Cir. 2004) .....................................................16

Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978) .....................................8, 12

Patton v. Yount, 467 U.S. 1025 (1984)......................................................................................20

Philadelphia Newspapers v. Hepps, 475 U.S. 767 (1986) ...................................................10

Poliquin v. Garden Way, Inc., 989 F.2d 527 (1st Cir. 1993) ...............................................21

Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984) ...........................................22

Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) ........................................ 20,22, 25-26

Publicker Industries, Inc. v. Cohen, 733 F.2d 1059 (3d Cir. 1984)..................................22

Republic of the Philippines v. Westinghouse Electric Corp., 949 F.2d 653 (3d Cir.
    1991) ...................................................................................................................................22

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980) ..................................22, 21

Sexton v. Dreyfus, 219 U.S. 339, 31 S. Ct. 256 (1911) ..........................................................14

Siedle v. Putnam Investment, Inc., 147 F.3d 7 (1st Cir. 1988)........................................ 11-13, 19

United States v. Amodeo, 71 F.3d 1044 (2d Cir. 1995) ...........................................12, 23

United States v. Anguillo, 897 F.2d 1169 (1st Cir.), cert. denied, 498 U.S. 845
    (1990)...................................................................................................................................20

United States v. Continental Airlines, Inc., (In re Continental Airlines), 150 B.R.
    334 (D. Del. 1993) ...............................................................................................................7

United States v. Moreno Morales, 815 F.2d 725 (1st Cir.), cert. denied, 484 U.S. 966 (1987) .................................................................................................................20

United States v. Stackpole, 811 F.2d 689 (1st Cir. 1987)..............................................20

United States v. Zenon-Encarnacion, 387 F.3d 60 (1st Cir. 2004)....................................7

Virginia Department of State Police v. The Washington Post, 386 F.3d 567 (4th Cir. 2004) .........................................................................................................22

## STATE CASES

Grande & Son, Inc. v. Chace, 333 Mass. 166, 129 N.E.2d 898 (1955) .........................10

NBC Subsidiary (KNBC-TV), Inc. v. The Superior Court, 20 Cal. 4th 1178, 980 P.2d 337, 86 Cal. Rptr. 2d 778 (Cal. 1999) ........................................................22

The Boston Herald v. Sharpe, 432 Mass. 593, 737 N.E.2d 859 (2000).........................22

## FEDERAL STATUTES

11 U.S.C. § 107(a) ................................................................................................ 7, ibid

11 U.S.C. § 107(b)(1) ....................................................................................................10

11 U.S.C. § 107(b)(2) ........................................................................................... 7, ibid

11 U.S.C. § 1104.....................................................................................................16, 18

11 U.S.C. § 1106........................................................................................................9, 16

11 U.S.C. § 341.......................................................................................................15, 18

## FEDERAL RULES

Fed. R. Civ. P. 4.............................................................................................................9

Fed. R. Civ. P. 5.............................................................................................................9

Fed. R. Bank. P. 2004 ...................................................................................................15

## CONGRESSIONAL REPORTS

H.R. Rep. No. 595, 9th Cong., 1st Sess. 402-03 (1977) ................................................16

## OTHER AUTHORITIES

William T. Bodoh, Protective Orders in the Bankruptcy Court: The Congressional Mandate of Bankruptcy Code Section 107 and its Constitutional Implications, 24 Hastings Const. L.Q. 67 (1996) ............................................................8, 14

2 Collier on Bankruptcy ¶ 107.02 (Lawrence P. King ed., 15th ed., 2004).................................8, 9

Harvey R. Miller, The Changing Face of Chapter 11: A Reemergence of the Bankruptcy Judge as Producer, Director, and Sometimes Star of the Reorganization Passion Play, 69 Am. Bankr. L.J. 431 (1995) ...........................................14

Restatement (Second) of Torts, § 573, cmt. c, illustration 5 (1977)...............................................10

## STATEMENT OF THE ISSUES

1.       Whether the bankruptcy court correctly ruled that the public has a presumptive right of access under Section 107(a) of the Bankruptcy Code and the common law to the report of a judicially appointed bankruptcy examiner filed with the court.

2.       Whether the bankruptcy court acted within its discretion in determining that parties seeking to seal the contents of an examiner's report had failed to carry their burden of making a particularized showing that sealing was warranted under either Section 107(b)(2) of the Bankruptcy Code or the common law.

3.       Whether the bankruptcy court's order granting public access to an examiner's report may be affirmed on the alternative ground that the First Amendment provides the public with a right of access to the report.

## STATEMENT OF THE CASE

**A.       Procedural History**

This is an appeal from the denial of a motion brought by Gary Gitto ("Appellant" or "Gitto"), the founder and former officer and director of the Debtor, Gitto/Global Corporation (the "Debtor), to seal the report of a judicially appointed Chapter 11 examiner, which was filed in the Chapter 11 bankruptcy case of the Debtor.

On September 24, 2004, Debtor filed its voluntary Chapter 11 petition commencing the underlying bankruptcy case. Appendix ("A.A.") 077-81. On October 7, 2004, the United States Trustee ("UST") requested that the bankruptcy court appoint a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) or, alternatively, an examiner under 11 U.S.C. § 1104(c). A.A. 088-92. The UST stated that a trustee or examiner was required to conduct a thorough examination of allegations of pre-petition financial misconduct by the Debtor and its former management. A.A. 091.

On October 14, 2004, the bankruptcy court found that "the appointment of an examiner in the Debtor's case pursuant to 11 U.S.C. § 1104(c)(1) is in the interests of the Debtor's creditors, and other interests of the Debtor's estate." A.A. 093. Accordingly, the bankruptcy court

approved the appointment of a Chapter 11 examiner and ordered that "the Examiner shall immediately begin an investigation into the existence of any prepetition fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management and business affairs of the Debtor." A.A. 094. The court further ordered that "the Examiner shall file a statement with the Court . . . reporting the preliminary or final findings of the Examiner, along with any recommendations of the Examiner for further investigation." A.A. 094.

On October 19, 2004, the bankruptcy court approved the appointment of Charles L. Glerum and the law firm Choate, Hall & Stewart, as Chapter 11 Examiner (the "Examiner") of the Debtor. A.A. 099-100. The bankruptcy court reaffirmed that the Examiner was to "conduct an investigation and issue a report." A.A. 100. Thereafter, the Examiner conducted his investigation by obtaining and reviewing documents and interviewing witnesses. Supplemental Appendix ("S.A.") 1-16, 19-32.[1] The production of documents and interviews occurred, in part, by order of the bankruptcy court under Rule 2004 of the Federal Bankruptcy Rules of Procedure. S.A. 17-18, 33-35.

On December 8, 2004, the Examiner sought permission from the bankruptcy court to file his forthcoming report (hereinafter the "Examiner's Report") under seal. A.A. 134-36. The Examiner also proposed that his Report would be served only on the UST, counsel for the Creditors' Committee, and LaSalle Business Credit, LLC (the Debtor's largest creditor). A.A. 136. On December 9, 2004, the bankruptcy court granted the Examiner's motion "subject to allowance of any future motion of any party-in-interest seeking release of Report." A.A. 137.

On December 13, 2004, Gitto filed a motion with the bankruptcy court seeking access to the Examiner's Report. A.A. 047 at Doc. No. 347. Other interested parties sought the same relief. A.A. 047-048, 051-52 at Doc Nos. 352, 356, 374, 385.

---

[1] The Appellee believes that certain portions of the record not included in the Appellant's Appendix are relevant to this appeal and, accordingly, has sought leave to file a brief Supplemental Appendix, which is submitted herewith.

On December 23, 2004, Appellee, Worcester Telegram & Gazette Corporation ("WT&G") moved to intervene and for public access to the Examiner's Report. A.A. 146-63. The Examiner opposed the motions for access filed by WT&G and other interested parties, A.A. 049-50, 51 at Doc. Nos. 367 & 375. Gitto also opposed WT&G's motion. A.A. 054 at Doc. No. 407.

Following a hearing on the various motions for access to the Examiner's Report, the bankruptcy court ordered the Examiner to file his Report under seal with the court by January 7, 2005. A.A. 171-72. The Examiner also was required to provide each individual named in the Report with a copy of only that portion of the Report relating to that particular individual. A.A. 171-72. Thereafter, any person seeking to keep sealed all or part of the Report was required to file a motion requesting such relief by January 25, 2005. A.A. 172.

In response to the bankruptcy court's order, the Examiner stated that he no longer sought to keep the Report under seal (apparently because the Debtor and others now had a largely unredacted copy of the Report). Motions to seal or redact all or portions of the Report were filed by approximately 26 persons and entities, including Gitto. WT&G opposed the motions. A.A. 90-97, 178-189, 217.

The bankruptcy court "reviewed all of the motions to seal, oppositions thereto, motions for access to the Report, all pleadings related to the foregoing, and the Report along with all of its exhibits," and then held a hearing on the matter. A.A. 218. Exercising its discretion under the common law and under Section 107(a) of the Bankruptcy Code, the bankruptcy court ordered that the Examiner's Report be publicly filed with the court on February 23, 2005, redacted of any bank account numbers contained therein. A.A. 213-15, 227. The order subsequently was stayed pending this appeal..[2]

---

[2] In addition to Gitto's appeal, Brian Griggs and the law firm of Bowditch & Dewey, LLP also have appeared herein. Mr. Griggs has moved to intervene to join Gitto's brief. Although his arguments are addressed herein, the record does not indicate whether Mr. Griggs filed a motion to seal below or filed a timely appeal. The record also does not indicate whether Bowditch & Dewey filed a timely appeal or sought leave to file their brief on March 6, 2005.

B.    **Statement of Facts**

On September 24, 2004, the Debtor, a plastics compounds manufacturer based in Lunenburg, Massachusetts, filed a voluntary Chapter 11 petition. A.A. 077-81. Recognized as a "national leader" in the plastics compounding industry, the company was founded by Appellant Gary Gitto, his sister, Nancy, and Frank Miller in 1992. See Gitto books raise concern: bankruptcy officer's filing, Worcester Telegram & Gazette (September 29, 2004) (S.A. 44). Charles Gitto (Gary Gitto's father) was named chairman of the Debtor in 1994. See id.

Gary and Charles Gitto previously were the subject of news reports in late 2003 and early 2004 after being arrested on charges of assaulting two Leominster police officers. The Gittos pleaded not guilty to the charges, which were covered extensively in the local press. See e.g., Gittos charged with assault; settle DEP suit, Worcester Telegram & Gazette (January 16, 2004) (S.A. 39); Plastics execs awaiting trial after altercation, Worcester Telegram & Gazette (December 10, 2003) (S.A. 36). In an unrelated matter, in January 2004, the company agreed to pay $250,000 to settle a civil case brought by the Attorney General's Office alleging violations of the state's air pollution and hazardous waste laws. See Gittos charged with assault; settle DEP suit, Worcester Telegram & Gazette (January 16, 2004) (S.A. 39); January 15, 2004 Attorney General's Office Press Release (available at http://www.ago.state.ma.us).

Shortly before the Debtor's bankruptcy filing, the Debtor appointed Mr. Thomas Doherty of Argus Management Corporation to serve as its Chief Restructuring Officer. A.A. 083. Mr. Doherty was appointed because the Debtor's officers, including Gitto, "had resigned or were about to resign . . . due to allegations that the Debtor was experiencing financial distress, and that accounting irregularities existed in the Debtor's financial books and records." S.A. 02. Upon assuming control, Mr. Doherty's initial review of the Debtor's accounting records indicated that the Debtor "likely participated in significant questionable business practices and accounting irregularities" before declaring bankruptcy. A.A. 089. The irregularities allegedly included overstating the company's revenue "through fictitious sales, inflated asset base, and obtaining the

benefits of float being provided by various financial institutions." A.A. 089. This "questionable conduct" appeared to have been ongoing for several years. A.A. 089.

All of the Debtor's approximately 80 employees were laid off before the bankruptcy filing and the plant was shut down. See generally Gitto/Global files for bankruptcy, Boston Business Journal (September 27, 2004) (S.A. 43). Based on his preliminary review of the Debtor's books and records, Mr. Doherty concluded that that as of September 2004, the Debtor had liabilities of at least $50,000,000, including more than $28,000,000 to LaSalle Business Credit, LLC ("Lasalle"), $3,000,000 to Clinton Savings Bank, and $4,000,000 to Fleet Bank. A.A. 089-90.

Following the Debtor's bankruptcy filing, more information about the alleged actions of the Debtors and its top executives, including Gitto, came to public light. According to news accounts, during a meeting of creditors on or about October 1, 2004, Mr. Doherty reported that he found "two sets of books containing vastly divergent financial information." Gitto Kept Two Sets of Books; 40-50 to be rehired, Worcester Telegram & Gazette (October 2, 2004) (S.A. 47). One set of books showed approximately $1 million in accounts payable but the second set showed approximately $12 million. See id. In addition, press accounts reported that Mr. Doherty discovered that the company had issued post-dated checks worth more than $2 million. Id.

The Debtor's financial affairs garnered further public attention when LaSalle, the Debtor's largest creditor, filed a 69-page complaint in this Court seeking the recovery of $30 million in damages and alleging various and sundry financial improprieties by the Debtor. See LaSalle Business Credit, LLC v. Gitto, et al., 1:04-cv-12227-DPW (D. Mass). See also Gitto accused of bilking $18.8M from lender in 'Secret Garden', Worcester Telegram & Gazette (November 2, 2004) (S.A. 52).

Understandably, the revelation of these alleged improprieties made this case the subject of intense and legitimate public interest and scrutiny. See e.g., Gitto books raise concern: bankruptcy officer's filing, Worcester Telegram & Gazette (September 29, 2004) (S.A. 44); Mini

Enron? Plastics co. is bankrupt, $50 million short, Boston Herald (October 13, 2004) (S.A. 50). This public interest and scrutiny continues. See e.g., Gitto assets fetch $8.9M; Agawam-based buyer to keep business going, Worcester Telegram & Gazette (December 9, 2004) (S.A. 56); Filing detail Gittos' lavish lifestyle; Ex-CEO wants alimony reduced, Worcester Telegram & Gazette (December 15, 2004) (S.A. 60); Judge unseals Gitto bankruptcy report, Boston Herald (January 7, 2005) (S.A. 63); Gitto/Global gets delay on report, Worcester Telegram & Gazette (February 23, 2005) (S.A. 64).

According to Gitto, law enforcement officials also have taken an interest in the case. Gitto's brief on appeal states that a federal grand jury has been convened and "indictments are likely." Appellant's Brief at 5.

SUMMARY OF ARGUMENT

The bankruptcy court correctly ruled that under Section 107 of the United States Bankruptcy Code, the Examiner's Report is a presumptively public record. Under Section 107(a), any document filed with the bankruptcy court is a public record to which attaches a presumption of public access. The Examiner's Report was prepared and filed pursuant to an order of the bankruptcy court by a judicially-appointed court officer. Accordingly, Section 107 grants the public a presumptive right of access to the Report. (Pages 7-10).

Under Section 107(b)(2), a court may seal a bankruptcy record only to protect a person from scandalous or defamatory matter. The bankruptcy court correctly ruled that in order to constitute "defamatory" material under the statute, the contents of the judicial record must be false. Any contrary interpretation would have the absurd result of requiring that virtually all bankruptcy files be sealed since an allegation of insolvency is defamatory per se. (Pages 10-12).

The bankruptcy court correctly concluded that the Examiner's Report was subject to the common law right of access. The public has a traditional right of access to investigatory proceedings in bankruptcy cases and investigative materials filed with the bankruptcy court. In addition, public access to filed investigative materials such as the Examiner's Report plays an

important role in promoting the bankruptcy goals of reorganization and restitution to creditors. (Pages 12-19)

The bankruptcy court correctly concluded that the Appellants failed to make a particularized showing of a need for a sealing order. The stated concerns of prejudicial pretrial publicity and the disclosure of embarrassing facts are insufficient as a matter of law to warrant a sealing order given the public interest in the contents of the Examiner's Report. (Pages 19-22).

The bankruptcy court's order may be affirmed on the alternative ground that the First Amendment provides the public with a presumptive right of access to the Examiner's Report. The Report was prepared as a result of a court order by a judicially-appointed officer of the court. The Report therefore is a judicial record of a civil case to which the public has an historical right of access which promotes public confidence and understanding of the bankruptcy system. (Pages 22-26).

## ARGUMENT

### A.    Standard of Review

The bankruptcy court's legal determinations with respect to unsealing the Examiner's Report are subject to de novo review. See United States v. Zenon-Encarnacion, 387 F.3d 60, 63 (1st Cir. 2004). The Bankruptcy Court's application of the legal standards and its denial of Gitto's motion to seal is reviewed for abuse of discretion. See Nixon v. Warner Communications, Inc., 435 U.S. 589, 599 (1978); F.T.C. v. Standard Fin. M'gmt Corp., 830 F.2d 404, 411 (1st Cir. 1987).

### B.    The Bankruptcy Court Correctly Ruled The Examiner's Report is Presumptively Public Under Section 107 of the Bankruptcy Code.

The bankruptcy court correctly ruled that the issue of public access to the Examiner's Report is governed by Section 107 of the Bankruptcy Code. By enacting Section 107, Congress "promulgated an express statutory scheme addressing public access to papers filed in bankruptcy courts." United States v. Continental Airlines, Inc., (In re Continental Airlines), 150 B.R. 334,

(D. Del. 1993). Accordingly, "issues regarding public disclosure of papers filed in connection with bankruptcy proceedings generally should be resolved under section 107." Id.; see generally, 2 Collier on Bankruptcy ¶ 107.02 at 107-2 (Lawrence P. King ed., 15th ed., 2004) (hereinafter "Collier").

The express language of Section 107(a) creates a presumption in favor of public access to all documents filed with the bankruptcy court: "[e]xcept as provided in subsection (b) of this section, a paper filed in a case under this title . . . are public records and open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a). Under Section 107(b), a sealing order may be entered only to "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title" or to protect confidential commercial information. 11 U.S.C. § 107(b)(2).

The plain meaning of Section 107(a) therefore requires that all papers filed with the bankruptcy court are "public records" unless the bankruptcy court "decides to protect the information pursuant to standards set forth in Section 107(b), which provides for the protection of commercial, confidential, or defamatory material." Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank and Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 433 n. 17 (S.D.N.Y. 1993), citing 11 U.S.C. § 107(a) & (b). See Lamie v. United States Trustee, 540 U.S. 526, 534, (2004) ("It is well established that when a statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.").

That the presumption of public access under 107(a) applies to all documents filed with the court is not in dispute among courts and commentators. See In re Apex Oil Co., 101 B.R. 92, 96-97 (Bankr. E.D. Mo. 1989) (noting the legal consensus that an examination report is a judicial record and, accordingly, holding that the court would restrict public access only to a narrow five-day window); In re Ionosphere Clubs, 156 B.R. at 433 (no right of public access attaches to an examiner's underlying investigative materials "until the documents he compiles are filed with the court") (emphasis added); see also 2 Collier ¶ 107.02 at 107-2 ("Section 107(a) provides that all

papers filed in a case under title 11 and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.") (emphasis added); William T. Bodoh, Protective Orders in the Bankruptcy Court: the Congressional Mandate of Bankruptcy Code Section 107 and its Constitutional Implications, 24 Hastings Const. L.Q. 67, 81 (1996) (hereinafter "W. Bodoh") ("The presumption of public access created by subsection 107(a) extends to all papers and documents filed with the bankruptcy court.") (emphasis added). Appellants cite no legal authority to the contrary.

The bankruptcy court properly applied the foregoing principles in ruling that the Examiner's Report is a presumptively public record because it was required to be filed in the Debtor's bankruptcy case. Examiners generally are required to file with the bankruptcy court "a statement of any investigation conducted." 11 U.S.C. § 1106(a)(4)(A). In the case at hand, the bankruptcy court adopted that requirement by specifically ordering that "the Examiner shall file a statement with the Court." A.A. 94, 100. Upon filing with the court, the Examiner's Report therefore became a public record to which a presumptive right of access attached.[3]

Gitto is left to argue that the "filing" of an examiner's report under Section 1106(a)(4)(A) does not mean that the report was "filed" for purposes of Section 107(a). As support for this extraordinary notion, Gitto contends that the requirement in Section 1106 that an examiner's report be delivered to certain interested parties would be unnecessary if the report also were publicly available to those persons in the courthouse. Of course, the same could be said of all pleadings, motions and briefs that must be filed with the court and served on parties. See e.g., Fed. R. Civ. P. 4 and Fed. R. Civ. P. 5. The requirement that the Examiner's Report be served on certain parties therefore has nothing to do with whether, upon filing with the court, the Report

---

[3] The bankruptcy court correctly found further support for this conclusion in decisions contrasting the public's right (or lack thereof) to unfiled underlying investigative materials with the presumptive right of access to examiners' reports filed with the court. See A.A. 220. See also In re Apex Oil Co., 101 B.R. at 97-98; In re Matter of Baldwin United Corp., 46 B.R. 314, 317 (Bankr. S.D. Ohio 1985); In re Ionosphere Clubs, Inc., 156 B.R. at 432.

is a presumptively public record.  Accordingly, there was no error in the bankruptcy court's determination that the Examiner's Report was presumptively public under Section 107(a).

## C.    The Bankruptcy Court Correctly Ruled That Section 107(b)(2) of the Bankruptcy Code Did Not Justify Sealing the Examiner's Report.

The bankruptcy court correctly ruled that its authority under Section 107(b)(2) to enter a sealing order to "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title" was inapplicable to the facts of this case.[4]  11 U.S.C. § 107(b)(2).  Gitto erroneously contends that because certain contents of the report might hold him up to scorn and ridicule in the minds of a respectable segment of the community, the materials are "defamatory" and the bankruptcy court committed an error of law in refusing to seal the Examiner's Report -- regardless of whether any statements in the Report are false.

Gitto's argument requires one to accept the extraordinary proposition that Congress intended to impose a mandatory sealing requirement on all bankruptcy filings containing true, but defamatory, statements of fact.  Given the nature of litigation in general, and bankruptcy litigation in particular, Gitto's interpretation of Section 107(b)(2) cannot withstand any level of scrutiny.  Indeed, if the statute means what Gitto says, then it is no exaggeration to say that Congress intended <u>all</u> bankruptcy filings to sealed from public view.  Accusations of financial insolvency -- the <u>sine</u> <u>qua</u> <u>non</u> of bankruptcy filings -- are defamatory <u>per se</u>.  <u>Restatement (Second) of Torts</u>, § 573, cmt. c, illustration 5 (1977) ("A, says to B of C, a merchant, that the latter is insolvent. A is subject to liability to C without proof of special harm."); <u>Grande & Son, Inc.</u> v. <u>Chace</u>, 333 Mass. 166, 168-69, 129 N.E.2d 898, 900 (1955).  Congress surely did not intend to establish a presumption of access to bankruptcy records in Section 107(a) only to

---

[4] The bankruptcy court recognized that impoundment also is proper to "protect an entity with respect to a trade secret or confidential research, development, or commercial information," and therefore ordered that all bank account numbers be redacted from the publicly accessible copy of the Report.  <u>See</u> 11 U.S.C. § 107(b)(1).

establish, in the statute's next breath, that all bankruptcy filings containing allegations of insolvency must be kept from the public, even if the allegations are true.

There certainly is no need to adopt such a bizarre interpretation of Section 107. A more reasonable interpretation of the statute is that its use of the term "defamatory" encompasses all of the modern elements of the tort, including proof of falsity. See generally Philadelphia Newspapers v. Hepps, 475 U.S. 767 (1986). At least one other bankruptcy court interpreting § 107 reached that same conclusion. See In re Whitener, 57 B.R. 707, 709 (Bankr. E.D. Va. 1986) ("The dissemination of truthful matter cannot be enjoined merely because the matter is prejudicial.").

The bankruptcy court's interpretation of the statute also is consistent with a Congressional intent in enacting Section 107 to codify the "traditional exceptions to public access," as set forth in Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978). W. Bodoh, 24 Hastings Const. L.Q. at 83; see also id. at 77 ("Given the fact that the enactment of section 107 and the Supreme Court's decision in Nixon were rendered almost simultaneously, it is possible to conclude that section 107 was intended to complement and implement the Nixon decision.") (internal quote marks and citations omitted); cf. In re Nunn, 49 B.R. 963, 694 (Bankr. E.D. Va. 1985) ("Congress intended the sealing of pleadings to be the exception rather than the rule."). The exceptions to public access found in Section 107(b) mirror those set forth in Nixon, where the Supreme Court explained the court may ensure that its records must not be used to "gratify private spite or promote public scandal," "serve as reservoirs of libelous statements for press consumption," or as "sources of business information that might harm a litigant's competitive standing." Nixon, 435 U.S. at 598.

In sum, the bankruptcy court correctly interpreted Section 107(b) as requiring proof of a false and defamatory statement as a condition of sealing bankruptcy court filings. The court therefore acted well within its discretion in ruling that the Appellants' failure to prove that the contents of the Examiner's Report were false was fatal to their motions to seal the Report.

**D.    The Bankruptcy Court Correctly Ruled That the Public Has a Common Law Right of Access to the Examiner's Report.**

The bankruptcy court also was correct in ruling, as an alternative basis for its holding, that the public has a common law right of access to the Examiner's Report. See generally Nixon, 435 U.S. at 597 (the courts of this country recognize a general right to inspect judicial records and documents); F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987) (recognizing common law presumption of access to records of civil cases); Siedle v. Putnam Inv., Inc., 147 F.3d 7 (1st Cir. 1988) (same).

Gitto contends that the common law right of access does not apply here because the bankruptcy judge did not rely on the Examiner's Report in rendering a judicial decision. This argument misapprehends the scope of the common law right of access and the nature of an examiner's investigation and report under the bankruptcy laws.

To be sure, the First Circuit, like other courts, have recognized that a "spectrum" of sorts exists with respect to the strength of any claimed right of access under the common law. See, e.g., Standard Fin. Mgmt., 830 F.2d at 408. At one end of the spectrum are those documents such as discovery motions as to which there "is no tradition of public access" and where public access would be "incongruous with the goals of the discovery process." See e.g., Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir. 1986). At the other end of the spectrum are "materials on which a court relies in determining the litigants' substantive rights." Standard Fin. Mgmt., 830 F.2d at 408 (internal quotations and citation omitted).

It would be a mistake to conclude, however, that the common law imposes a rigid requirement that the public's right of access only applies to non-discovery materials on which a court relies in rendering a judicial decision. As the First Circuit has observed, in order to avoid the necessity of "mindreading," documents which are "submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies." Standard Fin. Mgmt., 830 F.2d at 409. See also United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) (Amodeo II) ("Where statements or

documents in the middle of the continuum are at issue," and are documents that "are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or generally under seal").

For example, in <u>Siedle</u>, 147 F.3d 7, the First Circuit reviewed an order unsealing most of a case file over a party's objection that the files contained numerous confidential attorney client communications. The Court's decision was not at all based on what portions of the file had been relied on by the district court in rendering judicial decisions. Indeed, the Court expressly stated that if the justification for retaining the seal order was based upon nothing more than "fear of adverse publicity ... lifting the seal order would have been proper." 147 F.3d at 10. Instead, the Court entered a carefully tailored order designed to protect "arguably privileged material while at the same time minimizing the concomitant curtailment of the public's right of access to court filings." 147 F.3d at 12. Rather than permitting public access only to materials actually relied on by the trial court, the First Circuit required the parties to submit partially redacted filings, "camouflaging only information that it claims in good faith is protected by the attorney-client privilege" and charged the district court with resolving any "redacted-related" disputes. 147 F.3d at n.6.

Stated otherwise, to acknowledge the common sense notion that strength of the public's common law right of access may be informed by the extent to which certain documents have been relied on in determining the substantive rights of the parties is not the same as establishing a litmus test presumptively sealing all other court records from public view. Few would argue, for example, that the right to inspect complaints and answers on file with the court turns on whether the trial court has yet relied on those pleadings in rendering a substantive decision, or that the settlement of a case before any substantive ruling is made precludes the public from determining what business has been brought to the court. Gitto's myopic focus on whether the bankruptcy court has yet relied on the Examiner's Report in determining the substantive rights of the parties therefore ignores the more crucial inquiry -- that the Examiner's Report is itself the result of a judicial order and is the work product of a judicially appointed officer of the court.

1.    The Nature of an Examiner's Duties Support a Finding that the Common Law Right of Access Applies to His Report.

"The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985). In the first instance, the administration and protection of the bankruptcy estate and reorganization of a debtor is carried out by the debtor as a "debtor-in-possession." The administration of the estate and reorganization process, however, is supervised and informed by other parties, including the United States Trustee, creditors committees and security holders committees. In certain instances, the parties or the bankruptcy may deem it necessary to retain an independent third-parties, including Chapter 11 trustees and examiners, to aid in the reorganization process. See 11 U.S.C. § 1104; see also Harvey R. Miller, The Changing Face of Chapter 11: A Reemergence of the Bankruptcy Judge as Producer, Director, and Sometimes Star of the Reorganization Passion Play, 69 Am. Bankr. L. J. 431, 433 (1995) (hereinafter "H. Miller").

In both Chapter 7 and Chapter 11 cases, the examination of the debtor and others plays a crucial role in achieving the goals of bankruptcy. "'The sweeping general examination' of debtors and others to recover assets and uncover fraudulent conduct is a traditional feature of bankruptcy jurisprudence that is traceable to the first bankruptcy statute enacted by the English Parliament more than 450 years ago."[5] In re Symington, 209 B.R. 678, 683 (Bankr. D. Md. 1997), quoting 5 Remington on Bankruptcy § 1979 (1953 ed.). Cases have "long emphasized the importance and breadth of the examination rights afforded to a bankruptcy estate representative, so that 'the rights of creditors may be preserved.'" Id., quoting Cameron v. United States, 231 U.S. 710, 717-18, 34 S.Ct. 244 (1914). Indeed, investigations of the debtor and others are "an

---

[5] American bankruptcy law is "firmly rooted in English soil." Baltimore Sun Co. v. Astri Inv. Mgmt. & Sec. Corp. (In re Astri Inv. Mgmt. & Sec. Corp.), 88 B.R. 730, 736 (D. Md. 1988). "We take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we copied the system." Sexton v. Dreyfus, 219 U.S. 339, 344, 31 S.Ct. 256, 257 (1911) (Holmes, J.).

essential element in the formulation of a Chapter 11 plan or in a Chapter 7 trustee's ability to make any distribution to creditors." In re Recoton Corp., 307 B.R. 751, 759 (Bankr. S.D.N.Y. 2004).

Historically, "a creditor or even the bankrupt himself [was] entitled to examine the testimony given at hearings as well as books and records in the possession of the trustee." In re Symington, 209 B.R. at 678 (discussing examinations under Section 21(a) of the Bankruptcy Act of 1898, the direct antecedent of Rule 2004), quoting In re Saur, 122 F. 101 (S.D.N.Y. 1903). Contrary arguments were soundly rejected:

> The contention really amounts to this, that the examination provided by section 21a should be held to be a secret inquisition, at which only certain persons may be present. Aside from the inherent difficulty in determining just who might and who might not attend such examination, it is not clear by what authority . . . [the] court, could convert this bankruptcy proceeding . . . into a secret session at which certain parties, having rights which may be affected by the questions asked or the answers given at the hearing, may be compelled to attend, but from which their counsel and other parties having rights involved in such proceeding, together with their counsel, may be excluded.

In re Prussian, 255 F. 857, 859-60 (E.D. Mich. 1919).

Under modern bankruptcy procedures, investigations of debtors often occur at an initial § 341(a) meeting of creditors, see 11 U.S.C. § 341(a)[6], or Rule 2004 examinations, see Fed. R. Bank. P. 2004.[7] These proceedings, similar in nature to the investigative work of an Examiner,

---

[6] Section 341 mandates that there will occur an initial meeting of creditors and equity security shareholders at which the debtor will be examined. This meeting gives creditors "an opportunity to appear and to present claims, to examine the debtor, and to participate in discussions regarding the outcome of the bankruptcy." Baltimore Sun Co. v. Astri Inv. Mgmt. & Sec. Corp. (In re Astri Inv. Mgmt. & Sec. Corp.), 88 B.R. 730, 741 (D. Md. 1988). One purpose of the examination of the debtor at the § 341(a) meeting "has always been to uncover all of the debtor's assets, by the obtaining of full and truthful information." Id.

[7] A Rule 2004 examination is a "bankruptcy proceeding, undertaken upon the express authorization of a bankruptcy court. In re Symington, 209 B.R. at 684. Its purpose is "to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." In re Recoton Corp., 307 B.R. at 755; In re Duratech Indus., Inc., 241 B.R. 283, 289 (E.D.N.Y. 1999); In re GHR

are presumptively open to the public.  See In re Astri, 88 B.R. at 741(Section 341(a) meetings of creditors open to public); In re Symington, 209 B.R. at 693-94 (Rule 2004 examination presumed open to public).[8]

The appointment of an examiner and his duties are governed by the same statutes as those respecting a Chapter 11 trustee: 11 U.S.C. § 1104 and 11 U.S.C. § 1106, respectively.  The appointment of an examiner provides the court and parties with a "less drastic alternative" for providing "independent third party input into a chapter 11 case."[9]  7 Collier ¶ 1104.03[1] at 1104-35.  The examiner device was intended to "give the courts, debtors, creditors and equity security holders greater flexibility in handling the affairs of an insolvent debtor, permitting the court to tailor the remedy to the case."  Id. ¶ 1104.LH[2][b] at 1104-52-3, quoting H.R. Rep. No. 595, 9th Cong., 1st Sess. 402-03 (1977)  Section 1104(c) provides for the appointment of an examiner, on request of any party in interest or the United States trustee, to:

> [C]onduct such investigation of the debtor as is appropriate,
> including an investigation of any allegations of fraud, dishonesty,
> incompetence, misconduct, mismanagement, or irregularity in the
> management of the affairs of the debtor of or by current or former
> management of the debtor.

11 U.S.C. § 1104(c).  According to House and Senate bills the primary function of an examiner was to "conduct an investigation of the debtor's actions and financial condition and report the results of such investigation."  7 Collier ¶ 1104.LH[2][b] at 1104-53.

---

Energy Corp., 33 B.R. 451, 454 (Bankr. D. Mass. 1983) (one purpose of Rule 2004 investigation is "discovering assets and unearthing frauds").

[8] It should be noted that these cases were not concerned with documents filed in the bankruptcy case but with whether certain examinatory proceedings were presumptively public, hence the historical and logical analysis.

[9] Unlike a trustee, the examiner does not displace the debtor in possession.  7 Collier ¶ 1104.03 at 1104-35.  An examiner usually entails less expense to the estate and causes less delay than a trustee.  Id. at 1104-40.1.

The examiner's investigatory purpose is further defined in Section 1106, which reaffirms the investigation the examiner is to perform and requires the examiner to file a "statement" of any investigation conducted.[10]  11 U.S.C. § 1106(a)(3)-(4)(A) & (b); see also In re Ionosphere Clubs, Inc., 156 B.R. at 432 (purpose of examiner's investigation in bankruptcy is to discover what assets may exist for the estate); In re Gilman Services, Inc., 46 B.R. 322, 327 (Bankr. D. Mass 1985) ("The primary function of an examiner is to investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former management.").

The precise focus of the examiner's investigation is case-specific but often involves investigating allegations against former management of alleged fraud and impropriety. See e.g., First Am. Health Care of Ga., Inc. v. U.S. Dep't of Health and Human Services, 208 B.R. 992, 994 (Bankr. S.D. Ga. 1996) (examiner appointed where debtor's parent corporation and prior management committed fraud); In re Keene Corp., 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (examiner appointed for interest of creditors where debtor's present and former officers and directors allegedly fraudulently transferred profitable affiliates to keep assets out of hands of creditors); In re Gilman Services, Inc., 46 B.R. at  328 (Bankr. D. Mass. 1985) (examiner

---

[10] Section 1106(a) requires the examiner to, in relevant part:

> (3) . . . investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan.

> (4) as soon as practicable -- (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate.

appointed to investigate unexplained loss of assets since filing of bankruptcy petition and possible fraudulent conveyances).

Such was the situation in the present case.  In appointing the Examiner, the Bankruptcy Court ordered the Examiner to:

> [I]mmediately begin an investigation into the existence of any prepetition fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management and business affairs of the Debtor . . . [and] . . . file a statement with the Court . . . reporting the preliminary or final findings of the Examiner, along with any recommendations of the Examiner for further investigation.

Examiner Order at p. 2.

In sum, an examiner's report is the result of a judicial order entered by the bankruptcy court and is the work product of a judicially-appointed court officer.  Like Section 341(a) meetings of creditors and Rule 2004 examinations, an examiner's investigation is crucial in "discovering assets and unearthing fraud."  Cf. In re GHR Energy Corp., 33 B.R. at 454.  The information turned up by the investigation, accordingly, is "an essential element in the formulation of a Chapter 11 plan or in a Chapter 7 trustee's ability to make any distribution to creditors."  Cf. In re Recoton Corp., 307 B.R. at 759.  The same considerations that support public access to § 341(a) meetings and Rule 2004 proceedings therefore apply to the Examiner's Report.[11]

---

[11] Appellants seeks to characterize the examiner's role as being no different than discovery.  The argument has been rejected with respect to Section 341(a) meetings:

> While both discovery and a creditors' meeting are primarily concerned with obtaining information, the two proceedings have much different historical backgrounds.  Discovery is a pretrial process conducted principally by the parties with varying degrees of court supervision; a creditors' meeting is a formal part of a Chapter 7 bankruptcy, mandated by 11 U.S.C. § 341(a), supervised by a court clerk, and a proceeding at which substantial rights of creditors are often affected.

Under these circumstance, the public's common law right of access applies in full force to the Examiner's Report in this case. See generally In re Symington, 209 B.R. at 695 (the same benefits of open criminal trials apply to "bankruptcy proceedings convened for the interrogation of witnesses regarding debtors' actions and assets."). As in the context of Section 341(a) meetings, "openness will seemingly increase the likelihood that all potential creditors are made aware of the bankruptcy proceedings and are afforded the opportunity to present claims." In re Astri, 88 B.R. at 741. The Examiner's investigation and his Report serve an important role in Debtor's bankruptcy case: the investigation saved the creditor's committee considerable expense in conducting an investigation, it paints a fuller picture of the reasons behind the Debtor's bankruptcy, it can provide the basis for claims against the Debtor and its former management, it can aid in the discovery of hidden assets, it can serve as the basis for adversary proceedings to recover fraudulently transferred assets, and otherwise be used to object to Debtor's discharge. In addition, the Examiner's Report will provide important information to other creditors and potential creditors. Finally, making the report public will satisfy the public that the bankruptcy system is achieving its purposes and operating properly.

**E.     The Bankruptcy Court Correctly Ruled That Appellant Failed To Make A Particularized Showing Sufficient To Justify Sealing The Examiner's Report.**

A finding of good cause sufficient to overcome the public's common law presumption to public records must be based on a "particular factual demonstration of potential harm and not on conclusory statements." Anderson, 805 F.2d at 7. See also Standard Financial Management, 830 F.2d at 412 ("We decline to accept conclusory assertions as a surrogate for hard facts.").

---

In re Astri, 88 B.R. at 736. See also In re Vance, 176 B.R. 772, 773 (Bankr. W.D. Va. 1995) (fact that the U.S. Trustee conducts the § 341(a) meeting "does not change the essential judicial character of a section 341 meeting"). Similarly, while an examiner's investigation is primarily concerned with obtaining information, it too is a formal part of a Chapter 11 bankruptcy, permitted by 11 U.S.C. § 1104(c), supervised by a judicially appointed officer of the court, and the results of which often affect the substantial rights of creditors. See Appellant's Brief at 19 (conceding that the Examiner's Report is the "report of a judicial officer appointed by the court to conduct an investigation and make a report").

Accordingly, a court "must carefully balance the competing interests that are at stake." Siedle, 147 F.3d at 10. In cases of significant public concern, the "threshold showing required for impoundment of the materials is correspondingly elevated," and the interests asserted in support of impoundment must be balanced against the public's "substantial stake and interest in the proceedings at bar." Standard Financial Management, 830 F.2d at 412.

Gitto's contention that a sealing order is needed to protect his fair trial rights fails as a matter of law. The bankruptcy court considered and properly rejected this argument, observing that "many of the individuals advancing such argument are already defendants in a civil action pending in the United States District Court ... (Civil Action # 04-12227-DPW) where the allegations are substantially similar to information which the Examiner was told and included in the Report." A.A. 227. Appellant does not make any showing as to how the court's determination possibly could be an abuse of discretion, nor has he explained why information that already is publicly available in one case file will "irreparably harm appellant's ability to obtain a fair trial" if unsealed in another case. See Appellant's Brief at p. 20.

Even more fundamentally, Appellant has not demonstrated a realistic threat to his or any one else's fair trial rights (assuming that he will one day be indicted). The fact that publicity about a case has been widespread or that jurors have obtained some knowledge about a case does not prove that a defendant's fair trial rights have been violated. United States v. Stackpole, 811 F.2d 689, 697 (1st Cir. 1987). See also Patton v. Yount, 467 U.S. 1025, 1035 (1984) ("[T]he relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of defendant[s]"); Mu'Min v. Virginia, 500 U.S. 415 (1991) (barrage of publicity before murder trial that included numerous items of inadmissible, prejudicial information did not require questioning of individual jurors about the content of the publicity, even where eight of twelve individuals seated admitted some exposure to pretrial publicity).

Through jury voir dire, "a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict." Press-Enterprise Co. v. Superior

Court, 478 U.S. 1, 15 ((1986).  In this manner, criminal defendants in other cases have received fair trials despite far greater publicity than has accompanied this bankruptcy case.  United States v. Anguillo, 897 F.2d 1169, 1180-1184 (1st Cir.), cert. denied, 498 U.S. 845 (1990); United States v. Moreno Morales, 815 F.2d 725, 730-36 (1st Cir.), cert. denied, 484 U.S. 966 (1987).  Under these circumstances, Appellant cannot demonstrate that the Bankruptcy Court abused its discretion by rejecting his claims of prejudicial pretrial publicity.

The Appellants also argue that the Examiner's Report should be sealed because it contains inflammatory and prejudicial information.  That the Examiner's Report may include information that Appellantsconsiders personally discomforting or embarrassing -- including allegations of potential criminal activity or fraud -- does not justify sealing the Report from public scrutiny.  See Standard Financial Management, 830 F.2d at 412 ("The mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access."); see also Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993) ("At least in the absence of extraordinary circumstances, commercial embarrassment is not a 'compelling reason' to seal a trial record.").[12]  See A.A. 227.

Gitto's additional argument that the Examiner's Report should be sealed because it contains untested allegations also must fail.  As discussed above, exposing the statements contained in the Examiner's Report to public scrutiny enhances the chances that the truth will be discovered.  Richmond Newspapers, Inc., 448 U.S. at 596 (Brennan, J., concurring); In re Symington, 209 B.R. at 694.

In contrast, the important considerations supporting public access to the Examiner's Report compel its disclosure.  It takes little more than a brief survey of daily media reports to recognize the public's intense interest in questions of corporate governance, particularly as it

---

[12] Indeed, proofs of claim and adversary complaints filed in bankruptcy courts routinely include allegations of misconduct, including intentional misconduct, against the fiduciaries of corporate debtors, which remain "prejudicial," in Appellant's parlance, absent further proceedings (not to mention the allegations of related criminal indictments, which are equally subject to public scrutiny once on file with a court).

relates to the impact of corporate fiduciaries' decisions on the fiscal health of the companies they manage (including private ones) and the public institutions that may finance them.  Indeed, in recent years, the bankruptcy courts have become an important source of information to the public on the financial impact of questionable corporate management (whether in the form of intentional misconduct or simply poor judgment).  This point is illustrated in the present case, which involves public allegations concerning a corporation and individuals who previously have been the subject of criminal and civil charges and a bankruptcy that has negatively impacted a significant number of the Debtor's employees and the community.  The impact on the community and the community's understandable interest in how the bankruptcy system adjudicates these allegations of improper business conduct strongly militates in favor of public access to the Examiner's Report.

**F.    The Public Has a First Amendment Right of Access to The Examiner's Report.**

The United States Supreme Court has adopted a two-part test for determining whether a First Amendment right of access attaches to a judicial proceeding.  The first part of the test, the "experience" factor, considers whether there is a historical tradition of openness to the proceeding at issue.  See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 589 (Brennan, J., concurring); Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 505-08 (1984) ("Press-Enterprise I"); Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986) ("Press-Enterprise II").

The second part of the test, the "logic" factor, considers whether public access plays a positive role in the functioning of the governmental process at issue by, for example, enhancing the quality and safeguarding the integrity of the system, fostering an appearance of fairness, and permitting the public to participate in and serve as a check upon the judicial process -- "an essential component in our structure of self government."  Globe, 457 U.S. at 606 (internal citation omitted); Press-Enterprise I, 464 U.S. at 508-10; Press-Enterprise II, 478 U.S. at 8-9.

In accordance with this two part test of experience and logic, the First Circuit has held that the First Amendment provides a right not only to attend criminal proceedings but also to inspect court records filed in such cases. See Globe Newspaper Co. v. Pokaski, 868 F.2d 497 (1st Cir. 1989). "The basis for this right is that without access to documents the public often would not have a "full understanding" of the proceeding and therefore would not always be in a position to serve as an effective check on the system. 868 F.2d at 502. See also In re Globe Newspaper Co., 729 F.2d 47, 52, 59 (1st Cir. 1984).

Application of the experience and logic factors to this case compels the conclusion that the public also has a First Amendment right of access to civil proceedings and the court records of those cases. See generally Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1067-71 (3d Cir. 1984) (applying two part test of history and functioning and finding First Amendment right of access to civil trials); Republic of the Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 659 (3d Cir. 1991) (First Amendment protects public's right of access to records of civil proceedings); Hartford Courant v. Pellegrino, 371 F.3d 49 (2d Cir. 2004) (First Amendment provides right of access to docket sheets); Virginia Department of State Police v. The Washington Post, 386 F.3d 567 (4th Cir. 2004) (recognizing First Amendment right of access to investigatory police records filed in civil case); NBC Subsidiary (KNBC-TV), Inc. v. The Superior Court, 20 Cal. 4th 1178, 980 P.2d 337, 86 Cal. Rptr. 2d 778 (Cal. 1999) (First Amendment right of access applies to civil proceedings); The Boston Herald v. Sharpe, 432 Mass. 593, 606-07, 737 N.E.2d 859, 869 (2000) (constitutional right of access applies to documents filed in civil domestic violence proceedings).[13]

---

[13]See also Joy v. North, 692 F.2d 880, 893 (2nd Cir. 1982), cert. denied sub nom., Citytrust v. Joy, 460 U.S. 1051 (1983) ("an adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny"); Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 252 (4th Cir. 1988) ("Because summary judgment adjudicates substantive rights and serves as a substitute for a trial, we fail to see the difference between a trial and the situation before us now."); In re Continental Illinois Sec. Litig., 732 F.2d 1302, 1308-10, 1314 (7th Cir. 1984) (constitutional presumption of public right of access applies to motion to terminate derivative claims, even if filed pursuant to a protective order).

As to the experience factor, the historical tradition of access to civil judicial proceedings and records is beyond dispute. See Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents. ... In contrast to the English practice, American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit.") (internal citation and footnotes omitted).[14]

In addition to the "favorable judgment of experience," access to the records of civil cases unquestionably plays a positive role in the functioning of the judicial process, the second factor to be considered in determining whether the First Amendment right of access applies. Globe, 457 U.S. at 605 (citation and internal quotation omitted). As the Supreme Court has stated, "in some civil cases the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases." Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 386 n. 15 (1979). Public access to court documents in civil cases "allows the citizenry to 'monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system.'" Federal Trade Commission v. Standard Financial Management Corp., 830 F.2d 404, 410 (1st Cir. 1987). See also Publicker, 733 F.2d at 1070 ("Public access to civil trials, no less than criminal trials, plays an important role in the participation and the free discussion of governmental affairs."). "Although courts have a number of internal checks, such as appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control. ... Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honest of judicial proceedings." United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995).

---

[14] See also Federal Trade Commission v. Standard Financial Management Corp., 830 F.2d 404 (1st Cir. 1987); Bank of America National Trust, 800 F.2d at 343; Continental Illinois Securities Litigation, 732 F.2d at 1308 (recognizing historical common law right of access to judicial documents).

Gitto erroneously contends that the public's right of access only extends to documents relied on by a court in rendering a judicial decision.  Given the broad purpose of the constitutional right of access, however, it cannot be so circumscribed.  In <u>Globe Newspaper Co.</u> v. <u>Fenton</u>, 819 F. Supp. 89 (D. Mass. 1993), for example, this Court held that the First Amendment provided the public with a right of access to the alphabetical indices of completed criminal cases.  The essence of the Court's functional analysis was not that trial courts relied on the indices but that access to the indices was significant to the public's understanding and examination of the judicial process.  More recently, in <u>Hartford Courant</u> v. <u>Pellegrino</u>, 371 F.3d 49 (2d Cir. 2004), the Second Circuit held that the public has a First Amendment right of access to docket sheets and case files, again without regard to whether the documents had been shown to have been relied on by a judge in rendering a decision.

Nor does the constitutional issue turn on whether there is a historical right of access to Examiners' Reports dating back to the time of the Framers.  As the Supreme Court has stated in the context of access to particular types of criminal trials, "Whether the First Amendment right of access to criminal trials can be restricted in the context of any particular criminal trial, such as a murder trial (the setting for the dispute in <u>Richmond Newspapers</u> ) or a rape trial, depends not on the historical openness of that type of criminal trial but rather on the state interests assertedly supporting the restriction."  <u>Globe Newspaper Co.</u> v. <u>Superior Court</u>, 457 U.S. 596, 605 n.13 (1982).  The constitutional right of access to records of civil proceedings similarly applies in full force to this case.

Recognition of the public's constitutional right of access to court records does not mean that the public never may be denied access to any portion of any record under any circumstances whatsoever.  It does mean, however, that the barriers to impoundment are extraordinarily high.

First, "[w]here … the state attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest."  <u>Globe Newspaper</u>, 457 U.S. at 506-507; <u>Press-Enterprise II</u>,

478 U.S. at 13-14; Pokaski, 868 F.2d at 505.  In addition, any sealing order must be "narrowly tailored to serve that interest." Id.

The First Amendment also requires that any sealing order must effectively serve the interest asserted by the proponents of closure.  Press-Enterprise II, 478 U.S. at 13-14 (restriction on public access must be "essential" to prevent harm "that closure would prevent"); Globe, 457 U.S. 596, 607 n.19, 610 (1982) (assessing effectiveness of closure order in protecting juvenile rape victims required distinguishing injury caused by testifying in general from incremental injury caused by testifying in the presence of the press); Pokaski, 868 F.2d at 505 ("the means chosen by the state must effectively promote the statute's objectives").

Finally, in those rare circumstances where access to a judicial record may be limited, the justification for the restriction must be articulated in specific findings made by the trial court sufficient to enable appellate review.  Richmond Newspapers, 448 U.S. at 581; Press-Enterprise II, 478 U.S. at 13-14.

For the reasons set forth in the sections of this brief addressing the public's right of access under Section 107 and the common law, the more stringent constitutional test for closure cannot be met in this case, providing independent grounds on which to affirm the bankruptcy court's order.

## CONCLUSION

For each and all of the foregoing reasons, Worcester Telegram & Gazette Corporation respectfully requests that the judgment of the bankruptcy court unsealing the Examiner's Report be affirmed.

**WORCESTER TELEGRAM &
GAZETTE CORPORATION,**

By its attorneys,

/s/ Aaron M. Wais

Jonathan M. Albano, BBO #013850
Rachael Splaine Rollins BBO # 641972
Aaron M. Wais, BBO #651445
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: March 9, 2005

## CERTIFICATE OF SERVICE

I, Aaron M. Wais, do hereby certify that on this 9th day of March, 2005, I caused copies of the foregoing **BRIEF OF APPELLEE WORCESTER TELEGRAM & GAZETTE** to be served electronically and via overnight mail on the foregoing parties:

Max D. Stern
Stern, Shapiro, Weissberg & Garin
Suite 500
90 Canal Street
Boston, MA 02114
Fax: 617-742-5858

Robert M. Buchanan, Jr.
Lisa E. Herrington
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109
Fax: 617-248-4000

Charles W. Rankin
Rankin & Sultan
One Commercial Wharf North
Boston, MA 02110

Michael J. Fencer
Jager Smith, P.C.
One Financial Center
4th Floor
Boston, MA 02111

Jeffrey D. Sternklar
Duane Morris LLP
470 Atlantic Ave., Suite 500
Boston, MA 02110

Peter J. Caruso
Caruso & Caruso, LLP
One Elm Square
Andover, MA 01810
Fax: 978-475-1001

Richard T. King
Office of the U.S. Trustee
Suite 200
600 Main Street
Worcester, MA 01608
Fax: 508-793-0558

Lisa D. Tingue
Office of the United States Trustee
446 Main Street
14th Floor
Worcester, MA 01608
Fax: 508-793-0558

Richard E. Gentilli
Bartlett, Hackett, Feinberg
10 High Street
Suite 920
Boston, MA 02110

Norman S. Zalkind
65a Atlantic Ave.
Boston, MA 02110

/s/ Aaron M. Wais
Aaron M. Wais